John Curtis DEWBERRY, Appellant,

v.

The STATE of Texas.

No. 72640.

Court of Criminal Appeals of Texas,

Oct. 20, 1999.

Linda C. Cansler, Beaumont, for appellant.

Rodney D. Conerly, Assist. DA, Beaumont, Matthew Paul, State's Atty., Austin, for the State.

## *OPINION*

HOLLAND, J., delivered the opinion in which McCORMICK, P.J., and MEYERS, MANSFIELD, KELLER and KEASLER, JJ., joined.

Appellant was convicted of the capital murder of Elmer Rode, which occurred on December 23, 1994. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in article 37.071, §§ 2(b)(1), 2(b)(2), and 2(e) of the Code of Criminal Procedure, the trial court sentenced appellant to death. *See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. *See* Art. 37.071 § 2(h). Appellant raises twenty-three points of error. We affirm.

In appellant's fourteenth, fifteenth and sixteenth points of error, he argues the

---

1. Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

evidence was legally insufficient to convict him of capital murder. In his seventeenth point of error, appellant argues the evidence was legally insufficient to support the jury's answers to the special issues at punishment. He improperly combines all four points of error into a single argument. We first address the points concerning the sufficiency of the evidence to convict appellant of capital murder.

■ The United States Supreme Court set the standard for reviewing legal sufficiency of the evidence in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Court examines the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See id.* at 319, 99 S.Ct. 2781; *Arnold v. State*, 873 S.W.2d 27, 30 (Tex.Crim.App.1993), *cert. denied*, 513 U.S. 830, 115 S.Ct. 103, 130 L.Ed.2d 51 (1994); *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App.1989); *Butler v. State*, 769 S.W.2d 234, 238 (Tex.Crim.App.1989). This Court must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *See Johnson v. State*, 967 S.W.2d 410, 412 (Tex.Crim.App.1998); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim.App.1988); *Gardner v. State*, 699 S.W.2d 831, 835 (Tex.Crim.App.1985). When reviewing the evidence, our role is not to become a thirteenth juror. This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder. *See id; Wilson v. State*, 863 S.W.2d 59, 65 (Tex.Crim.App.1993).

■ Appellant argues that this Court should find the evidence legally insufficient to convict him. Appellant does not claim, however, that all of the evidence admitted before the jury was insufficient. Instead, appellant argues this Court should not consider the testimony of Mark Bilfafano, Bobby Lee Trevino, and Mitchell King IV or the evidence of appellant's confession in our legal sufficiency review. Appellant contends the testimony of Bilfafano, Trevino, and King contained inadmissible hearsay statements made by Chris Dewberry, appellant's brother and co-defendant. Appellant's argument that the evidence is legally insufficient hinges upon the exclusion of this allegedly inadmissible evidence.

Contrary to the methodology suggested by appellant, when conducting a legal sufficiency review, this Court considers all evidence in the record of the trial, whether it was admissible or inadmissible. *See Johnson*, 967 S.W.2d at 412. *See, e.g., Fernandez v. State*, 805 S.W.2d 451 (Tex. Crim.App.1991); *Thomas v. State*, 753 S.W.2d 688, 695 (Tex.Crim.App.1988); *Chambers v. State*, 711 S.W.2d 240, 247 (Tex.Crim.App.1986). Because we are bound to consider all of the evidence, including the testimony of Bilfafano, Trevino, and King and appellant's confession, appellant's argument fails. **Accordingly, we overrule appellant's fourteenth, fifteenth, and sixteenth points of error.**

Appellant also asserts "there was insufficient evidence for the jury to answer the special issues as they did." Appellant confines his analysis to the future dangerousness special issue and the mitigation special issue. *See* Art. 37.071 §§ 2(b)(1), 2(e).

■ This Court has stated it will not conduct a sufficiency review of the jury's finding on the mitigation special issue. *See* Art. 37.071 § 2(e). The determination as to whether mitigating evidence calls for a life sentence is a value judgment left to the discretion of the factfinder. *See McGinn v. State*, 961 S.W.2d 161, 166 (Tex.Crim.App.1998), *cert. denied*, — U.S. ——, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998); *Green v. State*, 934 S.W.2d 92, 106–07 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). Therefore, we confine our analysis to the future dangerousness special issue, which states:

ISSUE NO. 1—Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

Art. 37.071 § 2(b)(1).

■ According to the standard set out in *Jackson v. Virginia,* this Court must determine whether, in the light most favorable to the prosecution, any rational trier of fact could have returned an affirmative answer to the future dangerousness special issue. *See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Nenno v. State,* 970 S.W.2d 549, 552 (Tex.Crim.App.1998); *Moore v. State,* 935 S.W.2d 124, 126–27 (Tex.Crim.App.1996), *cert. denied,* 520 U.S. 1219, 117 S.Ct. 1711, 137 L.Ed.2d 835 (1997). The facts of the offense alone can be sufficient to support an affirmative answer to the special issue. *See Nenno,* 970 S.W.2d at 552; *Walbey v. State,* 926 S.W.2d 307, 310 (Tex.Crim.App.1996); *Allridge v. State,* 850 S.W.2d 471, 487 (Tex. Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Often, the circumstances of the crime provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the future dangerousness special issue. *See Walbey,* 926 S.W.2d at 310; *Allridge,* 850 S.W.2d at 487.

■ The appellant argues that the State relied on inadmissible evidence to prove his guilt, and we should not consider the murder and robbery of Elmer Rode in our sufficiency analysis of the special issue. As pointed out above, we review admissible and inadmissible evidence when conducting a legal sufficiency review. *See Johnson,* 967 S.W.2d at 412. Therefore, we consider the instant offense in deciding whether the evidence was sufficient for a rational trier of fact to believe beyond a reasonable doubt that appellant would be a continuing threat to society.

The egregious facts of this offense indicated appellant planned, weeks before this offense, to carry out a murder and robbery. Joshua Vickers testified that he sold appellant a sawed-off, 20–gauge shotgun after Thanksgiving 1994. Appellant told Vickers he wanted the gun for "a jack move," which Vickers understood to mean a hijack. Mitchell King, who had been staying with appellant and his brother since August 1994, testified that a week before Christmas, appellant asked King if he "knew about making some money." Appellant told King he knew a man "that had some money and [appellant] could go and burglarize his house and take the money, get the money." Appellant also told King, "he knew the guy had a lot of money, had a lot of stuff, so [they could] get some money for Christmas." King testified that appellant said they were "going to have to shoot [the owner of the house to] get our money." When King asked why appellant wanted to kill the owner, appellant replied "it was something personal" between him and the guy.

The murder of Elmer Rode was brutal. His sister, Ginger Rode, discovered Elmer's body in his apartment on Christmas Day. Officer Daniel Holloway of the Beaumont Police Department was dispatched to the scene and testified he found Elmer Rode lying on the floor in the living room. Rode's hands were tied behind his back with a telephone cord, and his feet were tied together with a belt. A pillow with bullet holes was lying across his head. After Rode's funeral, Ginger discovered her brother's pawn ticket for the .22 caliber pistol while cleaning his house. The State later proved this pistol was stolen from Rode by appellant and/or his brother and was used to shoot Rode. The forensic pathologist testified there were four small caliber gunshot wounds and one contact shotgun wound to Rode's head. The pathologist also found evidence indicating Rode was beaten up and strangled at some point. Abrasions on Rode's wrists sug-

gested Rode struggled against his bonds before he was killed.[2]

The State also introduced evidence showing Rode was robbed. The bedroom was ransacked, and the bedroom door was removed from its hinges. A VCR in an unopened box, along with another VCR, were stolen from the residence. Rode's pickup truck was also missing. After the murder, Vickers went to appellant's apartment where he saw two VCRs—one in an unopened box. Appellant asked Vickers if he knew anyone who wanted to buy a VCR.

Mark Bilfafano provided evidence implicating both appellant and his brother in the murder and robbery of Rode. Bilfafano testified that appellant, accompanied by his brother, Chris, showed up at his house on December 24th. Appellant wore surgical gloves and was driving Rode's pick-up truck. Bilfafano testified he saw two VCRs and a handgun (which looked like a .22 caliber pistol) in the truck. He testified appellant was in possession of a shotgun which "looked like" the weapon that the State alleged appellant used to kill Rode. Bilfafano accompanied appellant and Chris to leave Rode's truck in a shopping center parking lot in Vidor, Texas. En route, Chris told Bilfafano "they killed somebody." Before leaving Vidor, appellant wiped down the truck.

Bilfafano's testimony indicated appellant showed no remorse for his actions after the murder. On the way back to Beaumont, appellant threw the keys to the pickup into the Neches River. Bilfafano also saw appellant in possession of about $400 in cash. Appellant told Bilfafano "we had to take care of business," that Chris "chickened out," and that "they tied [Rode] up." Appellant also informed Bilfafano "they killed somebody and they just laughed about it."

The evidence at trial further showed appellant and Chris exchanged the two VCRs and the .22 caliber pistol with Bobby

Trevino for $50 and 5 or 6 stones of "crack." Trevino, however, refused the shotgun after Chris told him "they put a pillow over a guy and blasted him with the [it]."

Two juvenile probation officers, Katie Durio and Ruth Hall, also testified during the punishment stage about their experiences with appellant. They testified appellant's records contained twelve "referrals" for offenses committed by appellant while under their supervision, including burglaries, other property crimes, and drug offenses. Appellant was ultimately committed to the Texas Youth Commission ("T.Y.C."). Durio and Hall testified appellant was a "violent" person and that he was a leader who "instigated things." He was "very bright until he [did not] get his way" and "manipulative" when he lost his temper.

The State proved appellant attempted to escape from custody while awaiting trial. A deputy sheriff testified that while he was transporting appellant and three other inmates back from a dentist's office appellant and another inmate, Keith Gulley, escaped from the county van. While the van was stopped at a traffic light, appellant and Gulley burst from the back door and ran away. They were found a short time later hiding in a field not far from where they fled from the vehicle. They had removed their handcuffs with a key that Gulley had acquired.

While incarcerated awaiting trial, appellant's behavior indicated a potential for future violent acts. Two officers, who supervised appellant while he was incarcerated, testified during punishment. A corrections officer testified that during a shakedown of appellant's single-man cell, appellant was found in possession of razor blades and sharpened paper clips which could have been used as or to fashion weapons. Another corrections officer testified that appellant was belligerent towards officers, "constantly cursing at us,

2. The pathologist testified Rode was killed "around" December 23rd.

making sexual references and preferences to us, what he wanted to do to us, what he thought we should do." That same officer testified that, in a separate incident, he discovered a bag in appellant's single-man cell containing 20 whole razor blades.

Gaye Bailey testified she knew appellant, that appellant had a bad reputation for being a peaceful and law-abiding citizen, and that he had a "very violent character." Laci Bailey Girior, a former girlfriend of appellant, testified that when she broke up with appellant, he broke into her house, stealing items of monetary and sentimental value.[3] She also testified appellant carried a knife during the time they dated. While appellant was in T.Y.C., he threatened to rape and kill Girior when he got out. She said that appellant never demonstrated "any kind of conscience for the things that he did that were bad."

Additionally, the State admitted details from the offense reports of appellant's escape from the van through the cross-examination of one of appellant's expert witnesses. The offense reports included statements from the third and fourth inmates in the van who both indicated appellant was a willing and active participant in the escape.

Steve Young also testified for the State. Young told the Court that, in his opinion, appellant had a violent character. While dating appellant's mother, Young became acquainted with appellant prior to appellant's T.Y.C. incarceration. Young stated that he witnessed appellant kill an armadillo with a bayonet. On another occasion, Young saw appellant in possession of brass knuckles. The State's psychiatric expert testified that his review of appellant's history and the facts of the instant case indicated "that [appellant] would pose a potential for danger in the future. So I would consider him to be likely to be dangerous in the future."

■ We conclude that appellant, in carrying out this crime, exhibited a callous and wanton disregard for human life. A jury can rationally infer future dangerousness from the brutality of the offense. *See Sonnier v. State,* 913 S.W.2d 511, 517 (Tex. Crim.App.1995). Additionally, the evidence establishes that appellant planned the capital murder of Elmer Rode, carried it out methodically and brutally, and showed no remorse or contrition for his actions. Future dangerousness may be supported in part by evidence of a lack of remorse or contrition. *See Rachal v. State,* 917 S.W.2d 799, 806 (Tex.Crim.App. 1996), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). The brutal nature of the murder/robbery of Rode, and appellant's lack of contrition and remorse, were sufficient for the jury to find appellant would be a continuing threat to society. *See Allridge v. State,* 850 S.W.2d at 488-89; *Rachal, supra; Sonnier, supra.* When combined with other evidence presented during the punishment stage of appellant's trial, we conclude the evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that appellant posed a future danger to society. *See Nenno,* 970 S.W.2d at 552; *Walbey,* 926 S.W.2d at 310; *Allridge,* 850 S.W.2d at 488-89. **This Court overrules appellant's seventeenth point of error.**

In his first, second, third, and fourth points of error, appellant argues the trial court erred in denying his motion for a change of venue. Appellant complains there was "so great a prejudice against him in Jefferson County that he could not receive a fair and impartial trial." Appellant also argues there existed a "dangerous combination" against him "instigated by influential persons," and he could not receive a fair trial.

■ Appellant argues the denial of his motion for change of venue denied him his right to due course of law under the Texas Constitution and his right to a trial by jury guaranteed by the Sixth Amendment to the United States Constitution. *See* TEX.

---

3. Appellant was incarcerated in the Texas Youth Commission for this burglary.

Const. art. 1, § 13; U.S. Const. amend. VI. However, appellant fails to distinguish his rights under the Texas Constitution from that of the federal constitution and combines all four points into one argument. Therefore, we only address whether appellant's rights under the United States Constitution were violated by the trial court's denial of his motion for change of venue. *See Heitman v. State,* 815 S.W.2d 681, 690 (Tex.Crim.App.1991).

■■■■■ Appellant claims that, as a matter of law, there existed so great a prejudice against him in Jefferson County that he could not receive a fair and impartial trial. Appellant's venue motion alleged "the publicity about this case has been so widespread, inflammatory, adverse and prejudicial as to raise a substantial doubt that defendant can obtain a fair trial in Jefferson County, Texas." He filed three affidavits in support of this motion. The State, however, filed affidavits sufficient to controvert the statements of appellant's compurgators. *See Coble v. State,* 871 S.W.2d 192, 199 (Tex.Crim.App. 1993), *cert. denied,* 513 U.S. 829, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994); *Lundstrom v. State,* 742 S.W.2d 279 (Tex.Crim.App. 1986)(on rehearing).[4] Because the State controverted the appellant's affidavits, appellant was not entitled to change of venue as a matter of law. *See Cooks v. State,* 844 S.W.2d 697, 730 (Tex.Crim.App.1992). Therefore, the issue of venue became a question of fact, and the trial court conducted a hearing on the merits of the motion. The judge thereafter denied the motion. We review the denial of a motion for change of venue under an abuse of discretion analysis. *See Ransom v. State,*

789 S.W.2d 572, 579 (Tex.Crim.App.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990).

■■■■ During the hearing, appellant called seven witnesses employed by newspapers, television stations, and radio stations in Jefferson County. Every witness testified to the extensive media coverage of the instant offense. On cross-examination, however, they each denied the coverage was prejudicial. Instead, they testified the media coverage was fair and accurate.

Appellant also provided five lay people to testify that they did not believe appellant could get a fair trial in Jefferson County. Not one person stated that the media's coverage had been prejudicial or inflammatory. Two of the five witnesses testified they had formed no opinion as to appellant's guilt or innocence. The third witness testified she had not *mentioned* the case *to anyone* in over a year. The other two witnesses, a bail bond person and an attorney, testified they did not believe appellant could get a fair trial and were not cross-examined by the State.

Appellant also called his trial counsel's secretary to testify. She produced 47 affidavits signed by people who believed appellant could not get a fair and impartial trial in Jefferson County. On cross-examination, she testified that she did not ask those affiants if they had discussed the case with other qualified jurors, even though the affidavits reflected that each affiant had discussed the case with other qualified jurors. She admitted the affiants' reasons for saying appellant could not get a fair trial "really had nothing to

---

4. In *Lundstrom v. State,* 742 S.W.2d 279 (Tex. Crim.App.1986)(on rehearing), this Court concluded the averments of the State's affiants, that the defendant could receive a fair trial, "substantially controverted those filed by the [defendant] and therefore complied with Article 31.04, V.A.C.C.P., in order to join the issue of the [defendant's] entitlement to a change of venue." This Court overruled *Davis v. State,* 19 Tex.App. 201 (1885) and *Carr v. State,* 19 Tex.App. 635 (1885) in reach-

ing this conclusion. *Lundstrom v. State,* 742 S.W.2d at 286–87. In *Coble v. State,* 871 S.W.2d 192, 199 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 829, 115 S.Ct. 101, 130 L.Ed.2d 50 (1994), where the language of the State's controverting affidavit was virtually identical to the language of the State's affidavits in the instant case, this Court stated "the State's affiant need not have actual knowledge of the defendant's affiant or his basis for knowledge."

do with what is in the affidavit," and that she obtained 40 of the affidavits from the Lamar University campus area where the victim worked as the Dean of Admissions.

The State's witness, Johnny Appleman, the District Clerk for Jefferson County, testified that Jefferson County had almost 200,000 potential qualified jurors. He stated although the media coverage had been extensive, he did not believe it would bar appellant from receiving a fair trial. Appleman also testified he and his staff could provide a fair and impartial jury panel.

 Based on the evidence presented at the hearing, we conclude appellant failed to establish that he could not receive a fair trial in Jefferson County.[5] To prevail on a motion for change of venue, a defendant must demonstrate that publicity about the case is pervasive, prejudicial, and inflammatory. *See, e.g., Bell v. State,* 938 S.W.2d 35, 46 (Tex.Crim.App.1996), *cert. denied,* 522 U.S. 827, 118 S.Ct. 90, 139 L.Ed.2d 46 (1997); *Teague v. State,* 864 S.W.2d 505, 509–10 (Tex.Crim.App.1993), *overruled on other grounds,* 871 S.W.2d 701, 712 (Tex.Crim.App.1993); *DeBlanc,* 799 S.W.2d at 704.

Appellant failed to meet this burden. No evidence in the record shows that the media released inflammatory, prejudicial, or pervasive information regarding the instant offense. Additionally, the record does not show any prejudice in Jefferson County so that the likelihood of appellant obtaining a fair trial by an impartial jury was doubtful. *See Ransom,* 789 S.W.2d at 579; *DeBlanc,* 799 S.W.2d at 704. Hence, we hold the trial court did not abuse its discretion by finding that appellant failed

to show there was an "inherent prejudice in the publicity that has been demonstrated to the Court" and by denying appellant's motion to change venue.

 After denying appellant's motion, the court expressly stated that it would reconsider the venue issue during voir dire should the need arise. A trial court may use the jury selection process to gauge the tenor of the community as a whole. *See Bell,* 938 S.W.2d at 46. Appellant renewed his venue motion during voir dire and now asserts that the first two jury panels were quashed by the trial court for reasons related to appellant's motion for change of venue. The record, however, reveals otherwise.

Pursuant to appellant's motion, the first jury panel was quashed because the trial court began to voir dire the panel before the court reporter was present. A second panel was called. During the voir dire of the second panel, the State urged a motion to quash because appellant's mother had been in contact with members of the panel. The trial court denied the motion. A panel member later explained during voir dire, however, that some of his students mentioned they had seen him on television at the courthouse in the murder case. The member denied having seen the television report, but indicated that it bothered him. Nevertheless, he stated his ability to deliberate would not be adversely affected. After this exchange, appellant reurged his motion for change of venue, claiming the persistent negative publicity of the trial was continuing as shown by the veniremember's testimony. The trial court denied the motion.

> Merely because a particular case is publicized in the media does not give rise to an automatic showing of prejudice such that a defendant is entitled to a venue change—jurors do not have to be totally ignorant of the facts and issues of a particular case. *Id.*

---

**5.** Appellant faced a heavy burden to prove "the existence of such prejudice in the community that the likelihood of obtaining a fair and impartial jury is doubtful." *DeBlanc v. State,* 799 S.W.2d 701, 704 (Tex.Crim.App. 1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991); *Nethery v. State,* 692 S.W.2d 686, 694 (Tex.Crim.App. 1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986).

Eventually, the second panel was quashed when the trial court was informed that appellant's mother had been in contact with another member of the panel. In fact, after appellant had reurged his motion, the trial court observed that:

> Gentlemen, we have, according to my records here, 43 individuals that have qualified out of 56. Of the 13 that have been excused, none have been excused because they formed an opinion that—about this case one way or the other, either for Mr. Dewberry or against Mr Dewberry.
>
> The 13 people that have been excused have been excused either by consent of the parties because it might work a hardship on the individual, or they have been excused under 35.16 because of their beliefs about the death penalty, but no person has been excused because they have formed an opinion as to the guilt or innocence of Mr. Dewberry.

Counsel for both appellant and the State agreed with the trial court's assessment.

The voir dire of the third jury panel supports the trial court's decision to deny appellant's motion. The record reveals that only a small number of members had learned about the case from the media or had any prior contact with the victim. The few who did learn about the case from the media or had contact with the victim were dismissed by agreement or by defense challenges without opposition from the State. After general voir dire, the trial court overruled appellant's renewed motion for change of venue stating:

> In view of the answers given by members of the jury panel as far as the extent and nature of the publicity and the manner in which it may affect their service, the Court does not find there exists in Jefferson County, Texas, so

great a prejudice against your client as to prevent him from receiving a fair trial.

Given the record, appellant has failed to show the outside influences of the media affecting the community were so "inherently suspect," or were inflammatory, pervasive or prejudicial, as to raise doubt about the likelihood of his obtaining a fair and impartial jury in Jefferson County. *See Teague*, 864 S.W.2d at 510. Reviewing the juror selection process as a whole, the trial court correctly found no pervasive public prejudice existed towards the appellant. *See Bell*, 938 S.W.2d at 46. Hence, we conclude the trial court did not abuse its discretion in overruling appellant's second motion for a change of venue.[6] **Appellant's first, second, third and fourth points of error are overruled.**

In his fifth and sixth points of error, appellant complains of the trial court's denial of his motion to suppress his confession. Although he claims his rights were violated under both the Texas and the Federal Constitutions, appellant combines these two points of error into one argument and cites only the federal constitution. Because appellant fails to make an argument under the Texas Constitution, we only address whether appellant's federal constitutional rights were violated. *See Heitman*, 815 S.W.2d at 681. Appellant contends that because he was seventeen, a minor, at the time of the interrogation, his request to speak with his father was equivalent to a request to speak with counsel and should have terminated the interrogation.

■■■ We find it unnecessary to address appellant's contention that a minor's request for his father is equivalent to a

---

**6.** Lastly, appellant claims he was entitled to a change of venue because there existed in Jefferson County a "dangerous combination" against him "instigated by influential persons," preventing him from having a fair and impartial jury. Appellant neither raised the issue of a "dangerous combination" in his motion for change of venue nor during the hearing on his motion. Additionally, appellant's affidavits do not mention the existence of a "dangerous combination." Therefore, we conclude appellant failed to preserve this issue. TEX.R.APP. P. Rule 33.1.

request for his attorney.[7] Appellant was considered an adult for purposes of criminal prosecution because he was seventeen years old. *See* Tex. Pen.Code § 8.07(b). Therefore, we must only decide whether an arrested adult's request for his father is equivalent to a request for an attorney.

Appellant requested to speak with his father on several occasions. While an attorney can advise an accused on the legal and practical effects of speaking during an interrogation, parents normally are not prepared to give such advice. In fact, a parent may encourage the accused to speak when it would be best to remain silent. *See Randall v. State*, 712 S.W.2d 631, 632 (Tex.App.—Beaumont 1986, pet. ref'd).[8] Hence, we conclude that an accused's request to speak to a parent is not equivalent to a request for an attorney.

■■■■■■ The record fails to show appellant requested the assistance of counsel.[9] Evidence from the suppression hearing demonstrated that one of the interrogators told appellant he could call an attorney if he wanted. Appellant responded, however, by stating that he had not "done anything wrong. I don't need a lawyer." Given this record, we further conclude that appellant's request did not amount to a clear and unambiguous invocation of his right to counsel. *See Dinkins*, 894 S.W.2d

330; *Russell*, 727 S.W.2d 573; *Collins*, 727 S.W.2d 565.

■■■■■■ Appellant also contends that the trial court erred in failing to suppress his confession because his state of intoxication, coupled with the coercive atmosphere of alleged threats to his grandmother and girlfriend, affected his ability to make a knowing and intelligent waiver of his rights. "[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The defendant has a right to object to the use of the confession and the right to a hearing to determine whether the confession was voluntary. *See id.* at 377, 84 S.Ct. 1774. The trial court is the sole fact-finder at a *Jackson v. Denno* hearing and may choose to believe or disbelieve any or all of the witnesses' testimony. *See Green v. State*, 934 S.W.2d 92, 98–99 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Crim.App.1990), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other*

---

7. We note that the United States Supreme Court has declined to address the issue of whether an accused child's request to speak with a parent must be honored by the police before they continue interrogation. *See Riley v. Illinois*, 435 U.S. 1000, 98 S.Ct. 1657, 56 L.Ed.2d 91 (1978). The Tyler Court of Appeals has held that a juvenile's request for his or her parents did not invoke the juvenile's Fifth Amendment Rights. *See In the Interest of R.D.*, 627 S.W.2d 803 (Tex.App.—Tyler 1982, no writ.).

8. In *Randall v. State*, the twenty-year-old defendant alleged that he invoked his Fifth Amendment Rights by asking to speak with his father. Using the above rationale, the court of appeals held that a request to speak with a parent is not a per se invocation of defendant's Fifth Amendment Rights. *See Randall*, 712 S.W.2d at 632.

9. A defendant's invocation of his right to counsel must be clearly asserted. *See Etheridge v. State*, 903 S.W.2d 1, 18 (Tex.Crim.App. 1994); *Russell v. State*, 727 S.W.2d 573, 575–76 (Tex.Crim.App.1987); *Collins v. State*, 727 S.W.2d 565, 568 (Tex.Crim.App.1987), *cert. denied*, 484 U.S. 924, 108 S.Ct. 284, 98 L.Ed.2d 244 (1987). There are no magic words required to invoke an accused's right to counsel. *See Collins, supra.* "An invocation must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." *See Dinkins v. State*, 894 S.W.2d 330 (Tex.Crim.App.1995), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995).

*grounds, Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App.1991). Hence, this Court is not at liberty to disturb any finding which is supported by the record. *See id.*

During the hearing on appellant's motion to suppress, appellant testified he was extremely intoxicated when he was interrogated and that the police threatened to arrest his grandmother and girlfriend. The two interrogating officers, however, testified that appellant did not appear intoxicated, his eyes were not bloodshot and he did not smell of marihuana. They also testified appellant appeared to understand all of his rights and that he knowingly, intelligently, and voluntarily waived those rights. The officers denied having threatened appellant with the arrest of his grandmother or girlfriend. The trial court entered its findings of fact and conclusions of law that appellant was not threatened by the police, that he was not under any compulsion or persuasion by the police, and that he "knowingly, intelligently and voluntarily waived his rights." Because the record evidence supports the trial court's conclusions, we hold the trial court did not abuse its discretion in denying appellant's motion to suppress. **Appellant's fifth and sixth points of error are overruled.**

In appellant's seventh, eighth, and ninth points of error, he argues the trial court erred in admitting the testimony of three of the State's witnesses: Bilfafano, Trevino, and King. Each of these witnesses testified about statements made to them by appellant's co-defendant, Chris Dewberry. Appellant objected to these statements at trial on the grounds that they were hearsay.

■ Even though he now claims on appeal that his rights were violated under both the Texas and the federal constitutions, appellant's trial objection only referred to his protections under the United States Constitution. Because appellant failed to make a separate and distinct argument on appeal regarding his protections under the Texas Constitution, this

Court concludes he failed to preserve the error at trial. *See* Tex.R.App. P. 33.1(a)(1). Appellant combined all three points of error into one argument: inadmissible hearsay was allowed to go before the jury which he "could not challenge because the alleged declarant could not be cross-examined." Hence, we answer the three points of error together.

■ Appellant insists that Chris's statements to Bilfafano, Trevino, and King were not admissible as co-conspirator exceptions to the hearsay rule under Rule 801(e)(2)(E) of the Texas Rules of Criminal Evidence. Appellant claims the State failed to prove that a conspiracy existed between appellant and Chris or that Chris's statements to Bilfafano, Trevino, and King were made in the furtherance of such a conspiracy.

Contrary to appellant's position, however, the trial court did not admit the statements under Rule 801(e)(2)(E). Instead, the record reveals the trial court admitted this evidence as declarations against interest. *See* Tex.R.Crim. Evid. 803(24).

After the instant offense, appellant and Chris disposed of victim's truck by taking it to Vidor to drop it off in a parking lot. Mark Bilfafano accompanied them in his own truck. Bilfafano testified that he asked the brothers, "Where did y'all get the truck?" The State then asked Bilfafano, "Did somebody respond to [your question]?" Bilfafano indicated Chris responded and said, "We got this truck." Appellant objected on the ground this was hearsay. The trial court sustained the objection. The State again attempted to ask Bilfafano to state Chris's answer to his question about the truck. Appellant renewed his hearsay objection. The State requested a hearing outside the presence of the jury. The following exchange occurred:

THE COURT: You are seeking to have that as a declaration by co-conspirators?

[THE STATE]: It is a declaration of a co-conspirator. It is also a declaration

against penal interests, Your Honor, and it is clearly admissible under *Cofield versus State* [10] and the cases under that.

THE COURT: Mr. Makin.

[APPELLANT]: Your Honor, we feel that it is not clearly admissible, that it is a factual question for determination to be made by the Court.

The case of *State v. Williams* sets out the procedure and the method the Court will analyze to see if these statements were made in furtherance of the conspiracy.

Do you want me to go further into what the case says, Your Honor?

\* \* \*

[THE STATE]: In regard to that, Your Honor, I understand what the steps are in regard to a co-conspirator statement that it has to be in furtherance and corroborated.

Certainly disposing of stolen property is in furtherance of the co-conspiracy; but that aside, Your Honor, it's admissible as a statement against penal interest.

And if Chris—— if at any time, the way the law is, at any time Chris said, "I did something," that's not admissible. But as long as he says, "we did it," then it is admissible against this defendant. And I—— I just happen to know that the Court is very familiar with *Cofield* and those cases because of a case we got involved in earlier.

THE COURT: Just to be on the safe side, elicit from the witness the nature of the testimony that you intend to elicit in front of the jury so I have a better understanding of whatever he's going to say.

\* \* \*

[THE STATE]: When Chris got in the truck with you, Mark [Bilifano], what did Chris say?

[THE WITNESS]: He said, "We killed somebody."

[THE STATE]: Okay. And you asked him, "Who?" And let me get on down, statement of [appellant]. Later on when I was talking about tying him up, did Chris say "we had to tie him up?"

[THE WITNESS]: Yes, he did.

[THE STATE]: And I believe that's all the statements from Chris Dewberry.

THE COURT: Your objection is overruled. The testimony will be allowed. You may bring the jury back in.

[APPELLANT]: Your Honor, could we request that the Court enter a finding of fact with regard to whether, one, there was a conspiracy, two, whether [appellant] and Chris were members of that, and three, whether the statements were made in furtherance of that conspiracy?

[THE STATE]: Your Honor, it's our position that those statements are admissible under—— let me find—— 803(24). Right, 803(24).

THE COURT: You're not seeking to have that admitted as a declaration by a co-conspirator?

[THE STATE]: No, your Honor. Although I do believe they are admissible as to that. It is the statement that is clearly against the declarant, Chris Dewberry's penal interest.

[APPELLANT]: Your Honor, we would object to it on that grounds as, one, being hearsay, two, being a statement out of court by a declarant who is unavailable, as a denial of my client's Fifth and Sixth Amendment rights under the United States Constitution and the pertinent Texas statutes.

THE COURT: Mr. Makin, how do you address Rule 803 of the Rules of Evidence that says that the following are excluded from the hearsay rule, even though the declarant is available as a witness? And that would be 803 subparagraph 24, statements against inter-

---

**10.** *See Cofield v. State,* 891 S.W.2d 952 (Tex. Crim.App.1994).

est. Obviously it's a hearsay declaration.

[APPELLANT]: ... We feel it's hearsay.

THE COURT: If it was being offered against [appellant], it would not be hearsay.[11] It's only hearsay because the— declarant is Chris. Do you not agree with that?

[APPELLANT]: Yes, Your Honor.

THE COURT: Your objection is overruled. The statements will be allowed.

Based on this exchange, we conclude the trial court admitted the testimony regarding Chris's statements as declarations against interest.[12] The State then continued questioning Bilfafano. Bilfafano related that when Chris got in Bilfafano's truck, Chris told Bilfafano that "they had killed somebody." Chris also told Bilfafano, regarding the victim, that "they had to tie him up."

 The State also questioned Bobby Trevino about statements Chris made to him. Trevino testified that Chris always referred to "we" when he discussed committing the instant offense. Chris told Trevino they had put a pillow over a guy's head and shot him. Appellant objected to the testimony on hearsay grounds. The trial court overruled the objection. Appellant then requested the trial court grant him a running objection on hearsay grounds to Trevino's testimony regarding Chris's statements to him.[13]

Mitch King also testified as to statements made to him by Chris. King related that Chris made these statements during a phone conversation while King was in jail in Louisiana. Appellant requested a running objection "as to whatever Chris said to this witness." The trial court granted the request. King testified:

> [THE WITNESS]: He said, "We did what we talked about." I said, "What?" He said, "Well, we got him." I said, "Do what?" He said, "Well, we did what we was talking about." "Oh." He said, "Watch the news."

Chris told King how he and appellant committed the instant offense. Chris told King they put the pillow over the man's head before they shot him. Chris bragged that he and appellant took "VCRs, presents, a gun. Some things." Chris described how they entered Rode's house by just knocking on the door and going in. Chris told King they traded the VCRs to Bobby Trevino. King also learned from Chris that Chris and appellant shot the victim with a shotgun and dropped the victim's truck at "a shopping center somewhere in Vidor." This Court must now determine whether the described statements made to Bilfafano, Trevino and King were admissible under Rule 803(24).

11. A party's own statement is not hearsay and is admissible on the logic that a party is estopped from challenging the fundamental reliability or trustworthiness of his own statements. 2 STEVEN GOODE, OLIN GUY WELLBORN III & MICHAEL SHARLOT, TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 801.7, at 110–12 (2 ed.1993).

12. Even if there was some confusion about whether the trial court admitted this testimony under either the co-conspirator exception to the hearsay rule or under the provision excluding declarations against interest from the hearsay rule, this Court notes when a trial court's decision "is correct on any theory of law applicable to the case, it will be sustained." *See Howard v. State*, 941 S.W.2d 102, n. 6 at 111 (Tex.Crim.App.1996); *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.

App.1990). This is especially true "with regard to the admission of evidence." *McDuff v. State*, 939 S.W.2d 607, 619 (Tex.Crim.App. 1997), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997).

13. Appellant complains on appeal that the trial court did not conduct a hearing to determine if there was a sufficient indicia of reliability attached to Trevino's testimony regarding Chris's statements. Appellant argued the hearing was necessary in light of Trevino's perjury in a prior sworn statement to police and Trevino's own criminal history. We note appellant made no objection on these grounds at trial during Trevino's testimony, and he made no request for a hearing on this matter outside the jury's presence. Therefore, appellant failed to preserve this matter for appeal. TEX.R.APP. P. 33.1(a)(1).

■ In order for a declaration against interest to be admissible under Rule 803(24) of the Texas Rules of Criminal Evidence, the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statements. It is not necessary for the declarant to be unavailable as a witness. *See Bingham v. State*, 987 S.W.2d 54, 56–57 (Tex.Crim.App.1999); 2 STEVEN GOODE, ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL § 803.29, at 167–68. A statement which is self-inculpatory can be admissible against a defendant who was not the declarant of the statement.[14]

■ We first examine whether Chris's statements to Bilfafano, Trevino, and King were sufficiently self-inculpatory. As set out above, Chris's statements inculpated both himself and appellant in the capital murder of Elmer Rode. The State was careful to elicit accounts only of statements made by Chris referring to "we," which included both him and appellant. An admission against a co-defendant declarant's interest can be admissible against the defendant so long as it is sufficiently against the declarant's interest to be reliable. *See Williamson v. United States*, 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).[15] Because Chris's statements containing "we" implicated him in the capital murder of Rode, this Court concludes that his statements were sufficiently self-inculpatory to be reliable under *Williamson* and *Cofield*. Next, this Court reviews whether there was sufficient corroboration of Chris's statements.

■ We discussed the requirements for corroboration of a statement against interest in *Davis v. State*, 872 S.W.2d 743 (Tex.Crim.App.1994). The corroboration must be sufficiently convincing to clearly indicate the trustworthiness of the statement. A trial court should consider a number of factors: (1) whether guilt of declarant is inconsistent with guilt of the defendant, (2) whether declarant was so situated that he might have committed the crime, (3) the timing of the declaration, (4) the spontaneity of the declaration, (5) the relationship between the declarant and the party to whom the statement is made, and (6) the existence of independent corroborative facts. *See Bingham*, 987 S.W.2d at 58; *Davis*, 872 S.W.2d at 749.

The evidence at trial showed Chris's statements bore the necessary indicia of trustworthiness which this Court required in *Davis*. First, Chris's guilt of the capital murder of Elmer Rode is not inconsistent with appellant's guilt. The evidence at trial indicates Chris and appellant acted in concert throughout the commission of the offense. Secondly, Chris and appellant were seen together both before and after the capital murder of Elmer Rode, demonstrating Chris was situated so that he could have committed the instant offense. Third, Chris made the incriminating statements before he or his brother became suspects in the murder of Rode. Fourth, a majority of Chris's statements were either spontaneously made or made in response

---

**14.** In *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), the Supreme Court interpreted the Federal counterpart to Rule 803(24), Federal Rule of Evidence 804(b)(3). The Court explained that Rule 804(b)(3) was "founded on the common-sense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson*, 512 U.S. at 599, 114 S.Ct. 2431.

**15.** *See also Cofield v. State*, 891 S.W.2d at 956 ("we find the Supreme Court's reasoning and

analysis [in *Williamson*] persuasive."); *Bingham v. State*, 987 S.W.2d at 56 ("Nowhere within the text is there any mention of this exception being limited to cases in which the criminal defendant is the declarant of the statements, and there is good reason for this. The reason for this exception to the general exclusion of hearsay is that statements against interest are considered particularly trustworthy.... Thus, such statements are considered reliable, regardless of whether or not the criminal defendant is the declarant of the statement.").

to casual inquiries from (fifth) friends and criminal acquaintances not connected to the commission of the offense.

Finally, the State developed independent corroborative facts, which verified the statements made by Chris to Bilfafano, Trevino, and King. The police officers who investigated the crime scene testified that Rode was tied up before he was shot. A pillow had been placed over Rode's head, and he had been fatally shot with a shotgun. Chris and appellant had displayed two VCRs and a gun belonging to Rode. We conclude that the preceding independent corroborative facts, plus evidence demonstrating the other *Davis* factors, indicate Chris's statements were trustworthy under Rule 803(24). *See Davis*, 872 S.W.2d at 749; *Bingham*, op. at 58. Therefore, the hearsay accounts of Chris's statements were admissible under Rule 803(24).

■ Appellant also claims under this point that because the State neither produced Chris as a witness, nor demonstrated he was unavailable to testify, the admission of his statements violated appellant's right to confront the witnesses against him under the Sixth Amendment. As to Bilfafano, appellant has preserved this argument. But as to Trevino and King, appellant failed to preserve error under this argument.[16] *See* TEX.R.APP. P. 33.1(a)(1). Therefore, we conclude appellant has waived any potential error under the Confrontation Clause regarding the testimony of Trevino or King.

■ With regard to Bilfafano, Appellant relies on the traditional two-part test generally used for the application of the

Confrontation Clause to the admission of hearsay evidence. This test was used by the United States Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). According to *Ohio v. Roberts*, the State must first produce the declarant or demonstrate that the declarant is unavailable to testify. If the declarant is unavailable, the State must show the exception to the hearsay rule is firmly rooted in the Confrontation Clause or the statement satisfies "particularized guarantees of trustworthiness." JOHN W. STRONG ET AL., MCCORMICK ON EVIDENCE § 252, at 127 (4 th ed.1992). Later decisions by the Supreme Court, however, indicate the test for unavailability of the declarant in *Ohio v. Roberts* is not dispositive of appellant's claim.

In *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the United States Supreme Court held that an unavailability analysis is necessary under the Confrontation Clause only when the challenged out-of-court statement was made in the course of a prior judicial proceeding. In *White*, the declarant-victim was not shown to be unavailable to testify even though she was present at trial.[17] In his writ of certiorari, the defendant claimed his conviction should be vacated because the State failed to show the declarant-victim of the hearsay was unavailable as required by *Ohio v. Roberts*.

■ Following a three-step analysis, the Court disagreed with the defendant in *White*. First, the Court rejected the contention that "no out of court statement would be admissible without a showing of unavailability." *White*, 502 U.S. at 353, 112 S.Ct. 736 (quoting *United States v.*

---

16. At trial, appellant objected only to the hearsay nature of Chris's statements to Trevino and King. Because he did not object to any error under the Confrontation Clause, appellant waives this argument on appeal with respect to Trevino and King. *See Briggs v. State*, 789 S.W.2d 918, 923 (Tex.Crim.App. 1990) (stating that even constitutional error may be waived).

17. In *White*, the "State attempted on two occasions to call her [S.G.] as a witness, but she apparently experienced emotional difficulty on being brought to the courtroom and in each instance left without testifying. The defense made no attempt to call S.G. as a witness, and the trial court neither made, nor was asked to make, a finding that S.G. was unavailable to testify." *White*, 502 U.S. at 350, 112 S.Ct. 736.

*Inadi,* 475 U.S. 387, 392, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1985)). Unless the challenged statement was made in the course of a prior judicial proceeding, an unavailability analysis is unnecessary. *See id.* at 354, 112 S.Ct. 736.

In the instant case, Chris made the challenged statements to Bilfafano while attempting to dispose of Rode's truck. Because the statements were not made in the course of a prior judicial proceeding, we conclude, as the Supreme Court did in *White,* that an unavailability analysis is unnecessary.

Secondly, the *White* Court observed factors contributing to the statements' reliability that could not be reproduced at trial. *See id.* at 355–56, 112 S.Ct. 736. One, the statements tend to be spontaneous. A spontaneous declaration is made in a state of excitement where there is no opportunity to reflect on what is said. Two, the statements tend to be true. False statements made in the course of, e.g., procuring medical services, risk misdiagnosis or mistreatment. The Court held that such declarations carry "special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony. They are thus materially different from the statements at issue in *Ohio v. Roberts.*" *See id.* at 356, 112 S.Ct. 736.

The reliability of the statements made by Chris in the instant case can be analogized to the reliability factors in *White.* First, Chris made the incriminating statements to Bilfafano outside of a courtroom setting. Chris was not under interrogation; rather, the statements were freely and spontaneously spoken to a friend. Second, Chris placed himself at risk in making the statements at issue. Chris's statements were against his own penal interests because they implicated him in the commission of the capital murder of Elmer Rode. Given these facts, we conclude that Chris's statements to Bilfafano carried special guarantees of credibility and reliability that are not replaceable by courtroom testimony.

Lastly, the Court in *White* noted that, to not violate the purpose of the Confrontation Clause, the statements must be firmly rooted exceptions to the hearsay rule. *See id.* "A statement that qualifies for admission under a 'firmly rooted' hearsay exception is so trustworthy that adversarial testing can be expected to add little to its reliability." *Id.* at 357, 112 S.Ct. 736. When considering the evidentiary value and reliability in light of the great litigation costs, the *White* Court found no reason to exclude evidence admitted under the spontaneous declarations and medical treatment hearsay exceptions. *See id.*

Again analogizing to the reasoning in *White,* we conclude that the statement against penal interest exception is a firmly rooted exception to the hearsay rule. First, a statement made against one's penal interest is extremely reliable. *See id.* at 355–56, 112 S.Ct. 736. A co-defendant declarant is not likely to incriminate himself for a crime that he did not commit. Therefore, if a co-defendant declarant makes a statement incriminating himself and another co-defendant, there is a high probability that the statement is true. Second, such statements have tremendous evidentiary value. They can give reliable details to a crime that would otherwise never be learned.

Adversarial testing of the co-defendant declarant rarely strengthens the reliability or evidentiary value of these types of statements. In fact, having the co-defendant declarant as a witness in a trial actually under-cuts the reliability and evidentiary value of the statements. The co-defendant could invoke his privilege against self-incrimination, refusing to testify about the statements in question. Additionally, the co-defendant declarant could commit perjury. For example, he might lie about the events of the crime, or take complete responsibility for the crime, in an attempt to acquit the defendant. Likewise, he could shift the entire responsibility for the crime to the defendant in an

effort to make himself look better in the eyes of the law. In these scenarios, subjecting the co-defendant declarant statements to adversarial testing would undercut the reliability and truthfulness of the co-defendant declarant's out-of-court statements.

When other reliable and trustworthy evidence of the co-defendant declarant's statements exists, little (if any) value is gained by requiring adversarial testing of the co-defendant declarant at trial. Therefore, we conclude that the statement against penal interest exception is a firmly rooted exception to the hearsay rule.

■ Hence, we hold that the hearsay accounts of Chris's statements, which inculpated both him and appellant, were sufficiently reliable as to not offend the truth-determining function of the Confrontation Clause. We conclude appellant's rights under the Confrontation Clause were not violated by admission of Chris's statements to Bilfafano.[18] **This Court overrules appellant's seventh, eighth and ninth points of error.**

■ In appellant's tenth, eleventh, twelfth, and thirteenth points of error, appellant complains of the trial court's decision to deny his motions for continuance. Appellant contends he was entitled to a continuance in light of the State's "non-disclosure of material evidence as well as the inability to locate two key defense witnesses whose testimony was relevant, exculpatory, and absolutely necessary to the defense." Appellant insists the trial court's failure to grant his motions denied him his rights "under the Texas Constitution" and his "rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution." Appellant, however, fails to explain how he was denied due process and a fair trial. He also neglects to distinguish how protections of the Texas Constitution differ from those afforded by the federal constitution. See *Heitman v. State*, 815 S.W.2d at 690. Because appellant combines all four points into one argument, we answer them together.

Appellant contends that he urged motions for continuance at four times during his trial. Appellant orally requested his first continuance based on the unavailability of a witness during the pre-trial hearing on his motion to suppress his confession. Appellant informed the trial court he had issued a subpoena for Deputy Sheriff Steve McGraw prior to the hearing. The trial court informed appellant that McGraw was on vacation and would return by the week before the trial on the merits was to commence. Appellant requested a continuance to secure McGraw's testimony. The trial court denied the continuance because appellant could not show how McGraw's absence from the pre-trial hearing would harm appellant. McGraw was needed only for appellant's defense at trial. The trial court told appellant he could raise the matter again if the need arose and ordered the State to help locate and produce McGraw. Appellant did not raise the matter again.

Appellant based his second motion for continuance, urged during the State's case-in-chief, on the State's failure to disclose a benefit it provided to its witness, Mitch King. Appellant's ground for the continuance was to obtain King's parole records. Specifically, appellant wanted a copy of the State's letter to the Board of Pardons and Paroles which requested that the parole violator warrant on King be withdrawn so King could be a witness in a capital murder trial. Appellant claimed this was an undisclosed benefit to a State's witness, and appellant wanted to use the letter for cross-examination. The State immediately tendered a copy of the letter to appellant.

---

18. Even if appellant's rights under the Confrontation Clause were violated, appellant cannot show how he was harmed by admission of the statements. The same statements made by Chris to Bilfafano were introduced into the record by other witnesses during the trial.

Mr. King was held for cross-examination so appellant could question him on these matters. Appellant also subpoenaed the custodian of King's records at the Board of Pardons and Paroles who testified for appellant as to the withdrawal of King's parole violator warrant so he could testify for the State. Appellant's second motion for continuance was also only an oral motion.

Like the second motion, appellant's third motion for continuance concerned evidence which appellant claimed was exculpatory. During the State's case-in-chief, appellant claimed to have discovered evidence of a letter from a Mr. Sprousse to Elmer Rode concerning a young man named Sundown Fisette. In that letter, Mr. Sprousse warned Rode regarding Fisette and his attempts to extort money from Rode. According to the record, this letter was tendered to appellant, and appellant admitted it into evidence. Appellant had an opportunity to question both Sprousse and Fisette regarding the intimate details of their relationships with Rode and the letter's contents. Again, appellant's motion for continuance was only an oral motion.

Appellant's fourth motion for continuance concerned the unavailability of a witness, Raimie Griffin, III.[19] During his trial, appellant urged an oral motion for continuance regarding Griffin. Although appellant claimed he had been trying to find Griffin prior to trial, he did not obtain a subpoena for him until the State's case-in-chief had commenced. At the close of his defense, appellant stated, "subject to a motion, I believe, the defense would rest." The trial court permitted the motion before appellant rested. Appellant then filed a written motion for continuance. This written motion only concerned the unavail-

ability of Griffin. Appellant attached an affidavit to the motion.

The affidavit attached to appellant's motion stated that his investigator spoke with Griffin in September of 1996.[20] Trial counsel swore in his affidavit that his investigator made phone calls to Griffin which were not returned, and that on one day in September he made an unsuccessful attempt to see Griffin at his Houston address. The investigator made daily trips to the Houston address once the presentation of evidence began at his trial. During the State's case-in-chief, he made two attempts to contact Griffin at an address in Granite Shoals. Trial counsel also stated Griffin told his investigator in September that he was not with Mitch King in Austin prior to King's trip to Louisiana. Instead, he told the investigator he only met up with King in Louisiana on the night of December 24th when they were both arrested, and that King told him during their incarceration about the murder/robbery in Beaumont. Trial counsel claimed Griffin's testimony was needed to impeach King's testimony.

■ A motion for continuance not in writing and not sworn preserves nothing for review. *See* Art. 29.03; Art. 29.08; *Matamoros v. State,* 901 S.W.2d 470, 478 (Tex.Crim.App.1995); *Montoya v. State,* 810 S.W.2d 160, 176 (Tex.Crim.App.1989), *cert. denied,* 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991); *Smith v. State,* 676 S.W.2d 379, 385 (Tex.Crim.App.1984), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 490 (1985); *Lewis v. State,* 664 S.W.2d 345, 349 (Tex.Crim.App.1984); *Porter v. State,* 623 S.W.2d 374, 381 (Tex. Crim.App.1981), *cert. denied,* 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982).[21]

19. Griffin was Mitch King's companion and cell-mate when they were arrested in Louisiana during December of 1994.

20. Appellant's trial began in November of 1996.

21. In a dissenting opinion to a decision wherein this Court concluded the Speedy Tri-

al Act did not terminate a prosecution, Judge Clinton discussed why oral motions for continuance failed to preserve error. He wrote, "[t]his Court accords no dignity to an unsworn oral motion for continuance for want of a witness when made by an accused, ... one reason being that there is no assurance of the truth of certain factual matters required by statute to be stated unless written out and

Hence, we conclude appellant preserved nothing for appellate review in his three oral motions for continuance.[22]

Appellant's only written motion for continuance was his last motion for continuance. In this motion, appellant requested a delay to secure the presence of Ramie Griffin, III. Article 29.06 requires that a motion for continuance must state "the diligence which has been used to procure [a witness's] attendance" when it is based on the absence of a witness. We have interpreted this to mean not only diligence in procuring the presence of the witness, but also diligence as reflected in the timeliness with which the motion for continuance was presented. In *Kelly v. State*, 471 S.W.2d 65, 66 (Tex.Crim.App.1971), this Court concluded that a motion for continuance based on the absence of witnesses which was filed on the day the trial was set to commence did not "show the diligence required to support the motion." In *Varela v. State*, 561 S.W.2d 186, 190 (Tex.Crim. App.1978), this Court reviewed a motion for continuance based on an unavailable witness where the defendant "did not cause citation to be issued for the missing witness until ... the day before the trial on the merits began." Also, the motion was not filed until the day of the trial. We held that "the diligence required to support a motion for continuance has not been shown" and that any "error in the overruling of the motion was not presented." *See id.*

In the instant case, trial counsel's own affidavit indicates that as early as two months prior to trial the defense knew what testimony they wanted from Griffin,

and trial counsel knew of Griffin's importance as a cellmate and companion of Mitch King long before that. The record indicates, however, the defense did not attempt to subpoena Griffin until after the trial started. Moreover, they did not file their written request for a continuance until they had presented all of their evidence and rested their case. We conclude appellant failed to meet the requirement for diligence set out in Art. 29.06, and thus, preserved no error with his untimely written motion for continuance. *See Varela,* 561 S.W.2d at 190; *Johnson v. State,* 504 S.W.2d 493, 494 (Tex.Crim.App.1974); *Gonzales v. State,* 505 S.W.2d 819, 821 (Tex.Crim.App.1974); *Kelly,* 471 S.W.2d at 66.[23] **Appellant's tenth, eleventh, twelfth and thirteenth points of error are overruled.**

In his eighteenth, nineteenth, and twentieth points of error, appellant asserts the Texas capital murder statute is unconstitutional because it does not permit a trial court to instruct juries that capital murder defendants will not be eligible for parole for forty years if they are sentenced to life imprisonment. Appellant alleges that Article 37.071 violates both the Texas and the federal constitutions. Appellant argues that the denial of the parole law instruction in capital cases violates the equal protection provision in the Texas Constitution and the proscription against cruel and unusual punishment under both the Texas and the United States Constitutions. *See* U.S. Const. amend. VIII; Tex. Const. art. 1, § 3(a), § 13. He also claims the statute violates the due process provision of the

---

sworn to, see Articles 29.06 and 29.08, sufficient to warrant further investigation by opposing counsel or the trial judge." *Canada v. State,* 660 S.W.2d 528, 532–33 (Tex.Crim.App. 1983) (Clinton, J., dissenting).

**22.** Appellant urges this Court to conclude that all of his motions for continuance preserved the issues which they raised. In order to do this, he requests this Court exercise its "equitable powers." Because appellant fails to cite any authority for this request, and we are not

aware of any such authority, we refuse to do so.

**23.** Lastly, appellant urges this Court to consider the record in its entirety to determine if the denials of these four motions caused him to lose his right to due process. For the reasons previously discussed, we conclude that appellant failed to show either at trial or on appeal that his rights to due process and fairness were violated by the trial court's actions.

United States Constitution and the due course of law provision of the Texas Constitution. *See* U.S. CONST. amend. XIV; and TEX. CONST. art. 1, § 19. This Court has previously decided these issues adversely to appellant. *See Colburn v. State,* 966 S.W.2d 511, 515–17 (Tex.Crim.App. 1998); *Smith v. State,* 898 S.W.2d 838, 846–53 (Tex.Crim.App.1995) (plurality opinion), *cert. denied,* 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). Appellant offers no reason to revisit those decisions. **Appellant's eighteenth, nineteenth and twentieth points of error are overruled.**

In appellant's twenty-first, twenty-second, and twenty-third points of error, he argues that he was denied effective assistance of counsel. He alleges that ineffective assistance occurred when his trial counsel did not file a motion for new trial, conducted an incomplete investigation of the State's case, and failed to provide the trial court with support for his requested instruction on parole.

■ The standard for evaluating the effectiveness of trial counsel at both stages of a capital murder trial was set down by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and adopted by this Court in *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex.Crim.App.1986). Appellant must show by a preponderance of the evidence his counsel's representation fell below the standard of prevailing professional norms, and there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *See McFarland v. State,* 845 S.W.2d 824, 842 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993).

■ The review of trial counsel's representation is highly deferential. This Court indulges a strong presumption that trial counsel's conduct falls within a wide range of reasonable representation. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

It is appellant's burden to overcome that presumption. *See id.* Appellant "must identify the acts or omissions of counsel that are alleged" to constitute ineffective assistance and affirmatively prove that they fall below the professional norm for reasonableness. *See id.* at 690, 104 S.Ct. 2052. After proving error, appellant must affirmatively prove prejudice. *See id.* at 693, 104 S.Ct. 2052. It is not enough for appellant to show that the errors of trial counsel had some conceivable effect on the outcome of the proceedings. *See id.* He must show there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt and/or the sentence of death. *See id.* at 695, 104 S.Ct. 2052. Allegations of ineffectiveness must be founded in the record, and the record must demonstrate the alleged ineffectiveness. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *See id.* at 700, 104 S.Ct. 2052; *McFarland v. State,* 928 S.W.2d 482 (Tex.Crim.App. 1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997).

■ Appellant argues his trial counsel was ineffective for failing to file a motion for new trial as appellant requested. Appellant asserts this was necessary for "establishing a record on appeal on issues of facts that are outside the record." Without this, appellant complains that he procedurally defaulted on many claims. Appellant, however, fails to point to any specific issues of fact outside the record which were procedurally defaulted. Appellant fails to show, but for trial counsel's failure to file a motion for new trial, how the outcome of his trial or his appeal would have been different.

■ Appellant next asserts his trial counsel was ineffective for not investigating his case further than he did. Appellant in his brief offers no explanation of where his trial counsel's investigation fell short: that is, what areas might have been better investigated or what areas should

have been investigated, but were not. Hence, appellant fails to show how the acts or omissions of his trial counsel's investigation constituted ineffective assistance.

Lastly, appellant argues his trial counsel was ineffective at punishment for not presenting an argument based on the Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), in support of his request for a parole law instruction. This Court considered *Simmons v. South Carolina* when we concluded the trial court's refusal to instruct a capital jury on the parole law does not violate the Texas or United States Constitutions. *See Smith*, 898 S.W.2d at 846–47; *Colburn*, 966 S.W.2d at 515–17. Consequently, appellant fails to show that, but for his trial counsel's failure to cite *Simmons v. South Carolina* in his argument, the outcome of his trial would have been different.

Because appellant failed to base his claim that trial counsel's performance was deficient on the facts and details of the record, we conclude appellant failed to meet the first prong of the *Strickland* test. Appellant also failed to satisfy the second prong because he failed to show, or even allege, that, but for these alleged deficiencies, the outcome of his trial would have been different. *See McFarland v. State*, 928 S.W.2d at 500–03. **Appellant's twenty-first, twenty-second, and twenty-third points of error are overruled.**

The judgment of the trial court is affirmed.

PRICE, J., concurs in the result.

WOMACK, J., filed a concurring opinion in which JOHNSON, J., joined.

WOMACK, J., filed a concurring opinion in which, JOHNSON, J., joined.

I join the judgment of the Court.

I agree that the admission of the hearsay statement of Chris Dewberry to Mark Bilfifano did not violate the Confrontation Clause of the Sixth Amendment, as the appellant argues in point of error eight. I base my conclusion on the statement's particularized guarantees of trustworthiness. I do not agree that the reliability of this statement can be analogized to the reliability factors in *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736 (1992), *see ante* at 753, or that the hearsay exception for statements against penal interest is firmly rooted, *see ante* at 753.

I also believe that, if the statement were inadmissible, the error in its admission would be harmless. The only fact in this declarant's statement to Bilfafano that was not in his other statements, which were admitted without a constitutional objection, was that "they had to tie him up."