COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-202-CR
 
  
KAYLA 
ARLINE HARRIS                                                         APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 90TH DISTRICT COURT OF YOUNG COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        A 
jury convicted Appellant Kayla Arline Harris of the manufacture of 
methamphetamine of 400 grams or more and assessed punishment at forty-seven 
years’ confinement in the Institutional Division of the Texas Department of 
Criminal Justice. Appellant brings two points on appeal, challenging the legal 
sufficiency of the evidence linking her to the manufacture of methamphetamine 
and the evidence that the amount of methamphetamine was 400 grams or more.[2]  Because we hold that the evidence is legally 
sufficient to support the jury’s verdict, we affirm the trial court’s 
judgment.
        In 
her first point, Appellant correctly contends that for the State to obtain a 
conviction for the manufacture of a controlled substance, the State must 
affirmatively link the defendant either to an interest in the place where the 
manufacturing was taking place or to the actual act of manufacturing.[3]   Then, relying on case law dealing with the 
possession of controlled substances rather than their manufacture, Appellant 
argues that if the accused does not have exclusive possession and control of the 
place where the contraband is found, it cannot be concluded that the defendant 
had knowledge or control over the contraband unless there are additional facts 
and circumstances that affirmatively link the defendant to the contraband.[4]  Possession of a controlled substance may be 
accomplished secretly without anyone’s knowing of the contraband’s presence. 
For that reason, it is especially important to remember that the requirement of 
an affirmative link is designed to protect the innocent bystander from 
conviction based solely upon his proximity to someone else’s drugs.[5]  In a manufacturing case, the affirmative link must 
still be proven.[6]  The nature of the offense of 
the manufacture of methamphetamine, however, shifts the emphasis from protecting 
the innocent bystander from conviction based solely upon his proximity to 
someone else’s drugs to protecting the innocent bystander who merely happens 
onto a methamphetamine lab inadvertently.
        Although 
the affirmative links analysis is basically the same whether the offense is the 
possession of a controlled substance or the manufacture of a controlled 
substance, the factors considered may be different.[7]  
For example, manufacture of methamphetamine occurs in the open.[8]  
One cannot manufacture methamphetamine in a drawer or in an envelope.  When 
methamphetamine is being manufactured by the ether method, there is a strong 
odor, not merely a residual odor; the paraphernalia are relatively cumbersome 
and clearly in plain view; and the quantity of contraband will be relatively 
high.[9]  As a consequence, the fact that a 
defendant has a prolonged presence on the premises weighs more heavily against 
that defendant when methamphetamine is being manufactured on the premises.[10]
        Officer 
Richard Ferguson, a narcotics agent with the Cross Timbers Task Force who has 
been a police officer for twenty-three years, received information from a 
confidential informant that Jimmy Lee Clayton and Roy Pruitt were manufacturing 
methamphetamine at 389 Farmer Road, Young County, Texas, a rural location. The 
confidential informant additionally told Officer Ferguson that Pruitt had a 
shotgun because he was not going back to jail and that there was an extensive 
amount of surveillance equipment monitoring the residence. Officer Ferguson also 
learned that Appellant was Pruitt’s girlfriend. Officer Ferguson obtained a 
no-knock search warrant for the residence, and seven or eight officers were 
assembled to execute the warrant. No one entered or left the premises during the 
three to four hours before the police executed the warrant.
        When 
the officers arrived at the residence, they split up to surround the 
property.  The residence consisted of two structures connected by a 
breezeway. One structure was used for storage and contained the laundry room, 
and the other structure functioned as living quarters.  As the officers 
rushed the residence from the back, Officers Ferguson and Carolin Teague were in 
the group of officers who rushed the rear of the storage room.  While the 
officers were approaching, Officer Ferguson saw Clayton, who was wearing rubber 
gloves, run out into the backyard from the breezeway. Officer Teague saw 
Appellant run out of the side door of the storage room.  Officer Teague 
immediately apprehended Appellant without any problem.  The officers also 
apprehended a third person, Misty Gilmore, as she exited the rear of the 
residence.  Pruitt was not on the premises at the time of the search.
        After 
the officers secured the structures, they began searching and seizing drugs and 
paraphernalia.  When they entered the side door of the storage room, to the 
left of the door in the laundry room the officers found a washing machine, which 
was running, and they noticed a strong smell of ether coming from the washer and 
the room.  Inside the washing machine was a broken Pyrex dish.  
Officer Ferguson turned off the washer and saw what he believed was 
methamphetamine floating on top of the water as well as ether.  Officer 
Ferguson skimmed the drugs and ether off the water into a jar.  Also in the 
laundry room area, the officers found a plastic drinking pitcher that contained 
a “reddish-brown color powdery substance,” two glass jars containing a 
liquid with powdery residue, an active hydrogen generator (used to produce 
hydrogen chloride gas that separates out the methamphetamine from the solvent), 
and a black tote bag that contained paperwork with Appellant’s and her 
daughter’s names on it.
        In 
the backyard, officers found surveillance equipment, a bucket containing a white 
powdery residue hanging from a tree, and a trash barrel whose contents were on 
fire.  After the fire was extinguished, the officers found ether cans, 
lithium battery casings, and empty ephedrine packages in the barrel.  In a 
chicken coop, the officers found butane bottles that appeared to have once 
contained anhydrous ammonia.
        In 
the main house, officers searched each of the three bedrooms.  Officers 
found that the master bedroom belonged to Clayton.  In that room officers 
found a black bag containing 16.35 grams of methamphetamine, syringes, shotgun 
shells, a set of digital scales, a booklet entitled 
“Methamphetamine—Frequently Asked Questions,” and a coffee grinder with a 
reddish tint.  In the second bedroom, Pruitt’s bedroom, officers found 
syringes and a set of scales.  In the nearly empty third bedroom, officers 
found a bucket with syringes, bags containing white powdery substances, and drug 
paraphernalia.  Finally, they found a telescope and a black tote bag 
containing Gilmore’s personal effects near the back door.
        Appellant 
argues that the State’s evidence shows her mere presence at Clayton and 
Pruitt’s house on the day the police officer executed the no-knock search 
warrant.  Appellant was not in possession of a large amount of cash; she 
was not under the influence of drugs; she had no weapon; she made no furtive 
gestures; her fingerprints were not found on the premises.  Appellant 
claims that she did not attempt to flee and that she stopped as soon as she saw 
Deputy Teague.
        Clayton 
ran out wearing rubber gloves commonly worn when manufacturing methamphetamine. 
Appellant argues that he ran from the laundry room area.  Officer Ferguson 
said Clayton ran from the breezeway of the residence.  Officer Teague 
testified that Appellant ran out of the laundry room from the side door of the 
storage building.  A very strong odor of ether and hydrogen chloride gas 
came from the laundry room in the storage building.  The pitcher and jars 
containing chemicals and residue were in plain view in the laundry room.  
The bag containing paperwork of Appellant and her daughter was on the floor of 
the laundry room next to the running washing machine containing the drugs.  
The generator in the laundry room was running.  At the same time, it 
appeared that somebody in the room that Appellant exited had attempted to 
destroy evidence by putting the drugs, including the pyrex container, into the 
washing machine upon realizing that the officers were on the property.  
Appellant ran from the structure, and her running could be seen as an attempt to 
flee.
        In 
determining whether the evidence is sufficient to link the defendant to the 
contraband, the trier of fact is the exclusive judge of the credibility of the 
witnesses and the weight to be given their testimony.[11]  
Applying the appropriate standard of review,[12] we 
hold that the evidence, both direct and circumstantial, is legally sufficient to 
support the jury’s determination that there was a sufficient affirmative link 
between Appellant and the manufacture of methamphetamine to support her 
guilt.  We overrule Appellant’s first point.
        In 
her second point, Appellant contends that the evidence is legally insufficient 
to prove that the amount of methamphetamine that she was allegedly manufacturing 
was 400 grams or more.  As Appellant concedes, the State is no longer 
required to prove the amount of contraband separate and apart from the 
adulterants and dilutants that constitute the mixture.[13]  
The State is required to prove only that the aggregate weight of the controlled 
substance mixture, including adulterants and dilutants, equals the alleged 
minimum weight.[14]  And, as the State points 
out, the Texas Health and Safety Code defines “controlled substance” as ”a 
substance, including a drug, an adulterant, and a dilutant, listed in Schedules 
I through V or Penalty Groups 1, 1-A, or 2 through 4.  The term includes 
the aggregate weight of any mixture, solution, or other substance containing a 
controlled substance.”[15]
        After 
the evidence was collected, at least fifteen items were sent to John Harris, a 
forensic chemist at the Tarrant County Medical Examiner’s Office, for 
analysis.  Harris testified that each item contained methamphetamine. 
State’s Exhibit 43, admitted into evidence, shows that the methamphetamine 
seized, including adulterants and dilutants, had an aggregate weight of 512.6 
grams.
        Appellant 
complains specifically about the evidence retrieved from the washing 
machine.  Three State’s exhibits, Nos. 37, 38, and 39, contained the 
substance removed from the washing machine.  According to Harris’s 
testimony, the aggregate methamphetamine in these exhibits was more than 200 
grams. Harris testified that when he received the liquids, he observed that they 
were “two-phase liquid with some residue or sediment . . . . So to properly do 
the analysis, [he] separated the layers.  [He] took the top layer off and 
[he] analyzed it. Then [he] analyzed the bottom layer.  Then [he] analyzed 
the sediment.”  On direct examination, he testified that the top layer 
would not have contained water.  The top layer and the sediment contained 
methamphetamine; the bottom layer contained water.  The weight of the 
bottom layer, that is, the water layer, was not included in the weight of 
methamphetamine reported.  On cross-examination, Harris admitted that he 
did not test the top layer or the sediment for water and that it was possible 
that water was also included in those layers.
        Appellant 
argues that the top layers could have contained another substance that was not 
an adulterant or a dilutant and that the State had to prove that the other 
substances were in fact adulterants and dilutants.  We note that “‘[a]dulterant 
or dilutant’ means any material that increases the bulk or quantity of a 
controlled substance, regardless of its effect on the chemical activity of the 
controlled substance.”[16]  Consequently, if 
the water, detergent, or other foreign material that Appellant speculates may 
have been mixed in the top layer or the sediment did increase the bulk or 
quantity of the methamphetamine, then it is by definition an adulterant or 
dilutant.
        The 
jury heard the testimony of the forensic chemist regarding his extraction of the 
methamphetamine solution and, as the State argues, could have concluded beyond a 
reasonable doubt that the aggregate weight of the methamphetamine was 400 grams 
or more. Applying the appropriate standard of review,[17] 
we hold that the evidence is legally sufficient to prove that the 
methamphetamine exceeded 400 grams.  We overrule Appellant’s second 
point.
        Having 
overruled Appellant’s two points, we affirm the trial court’s judgment.
   
   
                                                                  LEE 
ANN DAUPHINOT
                                                                  JUSTICE
   
  
PANEL 
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
 
DELIVERED: 
August 4, 2005
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
We note that the statement of Appellant’s first point provides that she is 
appealing the factual sufficiency of the evidence linking her to the manufacture 
of drugs, but she does not argue that the evidence is factually insufficient, 
nor does she cite cases for that standard of review. Instead, she argues legal 
sufficiency of the evidence and cites cases for the legal sufficiency standard 
of review. In the interest of justice, we address the legal sufficiency of the 
evidence linking her to the manufacture of drugs rather than overruling her 
first point on procedural grounds. See Tex. R. App. P. 38.1(e), (h).
3.  
See East v. State, 722 S.W.2d 170, 172 (Tex. App.—Fort Worth 1986, pet. 
ref’d).
4.  
See Brown v. State, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995).
5.  
Poindexter v. State, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005).
6.  
East, 722 S.W.2d at 172.
7.  
Id. at 171-72.
8.  
Id.
9.  
See id.
10.  
See id.
11.  
Poindexter, 153 S.W.3d at 406.
12.  
See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Burden 
v. State, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); Dewberry v. State, 
4 S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 
(2000).
13.  
See Tex. Health & Safety Code 
Ann. § 481.112(f) (Vernon 2003).
14.  
Isassi v. State, 91 S.W.3d 807, 810 (Tex. App.—El Paso 2002, pet. 
ref’d).
15.  
Tex. Health & Safety Code Ann. 
§ 481.002(5) (Vernon Supp. 2004-05).
16.  
Id. § 481.002(49).
17.  
See Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Burden, 55 S.W.3d 
at 612; Dewberry, 4 S.W.3d at 740.