Kayla Arline Harris v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-202-CR

KAYLA ARLINE HARRIS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 90
TH
 DISTRICT COURT OF YOUNG COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Kayla Arline Harris of the manufacture of  methamphetamine of 400 grams or more and assessed punishment at forty-seven years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.  Appellant brings two points on appeal, challenging the  legal sufficiency of the evidence linking her to the manufacture of methamphetamine and the evidence that the amount of methamphetamine was 400 grams or more.
(footnote: 2)  Because we hold that the evidence is legally sufficient to support the jury’s verdict, we affirm the trial court’s judgment.

In her first point, Appellant correctly contends that for the State to obtain a conviction for the manufacture of a controlled substance, the State must affirmatively link the defendant either to an interest in the place where the manufacturing was taking place or to the actual act of manufacturing.
(footnote: 3)  Then, relying on case law dealing with the possession of controlled substances rather than their manufacture, Appellant argues that if the accused does not have exclusive possession and control of the place where the contraband is found, it cannot be concluded that the defendant had knowledge or control over the contraband unless there are additional facts and circumstances that affirmatively link the defendant to the contraband.
(footnote: 4)  Possession of a controlled substance may be accomplished secretly without anyone’s knowing of the contraband’s presence.  For that reason, it is especially important to remember that the requirement of an affirmative link is designed to protect the innocent bystander from conviction based solely upon his proximity to someone else’s drugs.
(footnote: 5)  In a manufacturing case, the affirmative link must still be proven.
(footnote: 6)  The nature of the offense of the manufacture of methamphetamine, however, shifts the emphasis from protecting the innocent bystander from conviction based solely upon his proximity to someone else’s drugs to protecting the innocent bystander who merely happens onto a methamphetamine lab inadvertently. Although the affirmative links analysis is basically the same whether the offense is the possession of a controlled substance or the manufacture of a controlled substance, the factors considered may be different.
(footnote: 7)  For example, manufacture of methamphetamine occurs in the open.
(footnote: 8)  One cannot manufacture methamphetamine in a drawer or in an envelope.  When methamphetamine is being manufactured by the ether method, there is a strong odor, not merely a residual odor; the paraphernalia are relatively cumbersome and clearly in plain view; and the quantity of contraband will be relatively high.
(footnote: 9)  As a consequence, the fact that a defendant has a prolonged presence on the premises weighs more heavily against that defendant when methamphetamine is being manufactured on the premises.
(footnote: 10)
 Officer Richard Ferguson, a narcotics agent with the Cross Timbers Task Force who has been a police officer for twenty-three years, received information from a confidential informant that Jimmy Lee Clayton and Roy Pruitt were manufacturing methamphetamine at 389 Farmer Road, Young County, Texas, a rural location.  The confidential informant additionally told Officer Ferguson that Pruitt had a shotgun because he was not going back to jail and that there was an extensive amount of surveillance equipment monitoring the residence.  Officer Ferguson also learned that Appellant was Pruitt’s girlfriend.  Officer Ferguson obtained a no-knock search warrant for the residence, and seven or eight officers were assembled to execute the warrant.

No one entered or left the premises during the three to four hours before the police executed the warrant.

When the officers arrived at the residence, they split up to surround the  property.  The residence consisted of two structures connected by a breezeway.  One structure was used for storage and contained the laundry room, and the other structure functioned as living quarters.  As the officers rushed the residence from the back, Officers Ferguson and Carolin Teague were in the group of officers who rushed the rear of the storage room.  While the officers were approaching, Officer Ferguson saw Clayton, who was wearing rubber gloves, run out into the backyard from the breezeway.  Officer Teague saw Appellant run out of the side door of the storage room.  Officer Teague immediately apprehended Appellant without any problem.  The officers also apprehended a third person, Misty Gilmore, as she exited the rear of the residence.  Pruitt was not on the premises at the time of the search.

After the officers secured the structures, they began searching and seizing drugs and paraphernalia.  When they entered the side door of the storage room, to the left of the door in the laundry room the officers found a washing machine, which was running, and they noticed a strong smell of ether coming from the washer and the room.  Inside the washing machine was a broken Pyrex dish.  Officer Ferguson turned off the washer and saw what he believed was methamphetamine floating on top of the water as well as ether.  Officer Ferguson skimmed the drugs and ether off the water into a jar.  Also in the laundry room area, the officers found a plastic drinking pitcher that contained a “reddish-brown color powdery substance,” two glass jars containing a liquid with powdery residue, an active hydrogen generator (used to produce hydrogen chloride gas that separates out the methamphetamine from the solvent), and a black tote bag that contained paperwork with Appellant’s and her daughter’s names on it.

In the backyard, officers found surveillance equipment, a bucket containing a white powdery residue hanging from a tree, and a trash barrel whose contents were on fire.  After the fire was extinguished, the officers found ether cans, lithium battery casings, and empty ephedrine packages in the barrel.  In a chicken coop, the officers found butane bottles that appeared to have once contained anhydrous ammonia.

In the main house, officers searched each of the three bedrooms.  Officers found that the master bedroom belonged to Clayton.  In that room officers found a black bag containing 16.35 grams of methamphetamine, syringes, shotgun shells, a set of digital scales, a booklet entitled “Methamphetamine—Frequently Asked Questions,” and a coffee grinder with a reddish tint.  In the second bedroom, Pruitt’s bedroom, officers found syringes and a set of scales.  In the nearly empty third bedroom, officers found a bucket with syringes, bags containing white powdery substances, and drug paraphernalia.  Finally, they found a telescope and a black tote bag containing Gilmore’s personal effects near the back door.

Appellant argues that the State’s evidence shows her mere presence at  Clayton and Pruitt’s house on the day the police officer executed the no-knock search warrant.  Appellant was not in possession of a large amount of cash; she was not under the influence of drugs; she had no weapon; she made no furtive gestures; her fingerprints were not found on the premises.  Appellant claims that she did not attempt to flee and that she stopped as soon as she saw Deputy Teague.

Clayton ran out wearing rubber gloves commonly worn when manufacturing methamphetamine.  Appellant argues that he ran from the laundry room area.  Officer Ferguson said Clayton ran from the breezeway of the residence.  Officer Teague testified that Appellant ran out of the laundry room from the side door of the storage building.  A very strong odor of ether and hydrogen chloride gas came from the laundry room in the storage building.  The pitcher and jars containing chemicals and residue were in plain view in the laundry room.  The bag containing paperwork of Appellant and her daughter was on the floor of the laundry room next to the running washing machine containing the drugs.  The generator in the laundry room was running. At the same time, it appeared that somebody in the room that Appellant exited had attempted to destroy evidence by putting the drugs, including the pyrex container, into the washing machine upon realizing that the officers were on the property.  Appellant ran from the structure, and her running could be seen as an attempt to flee.

In determining whether the evidence is sufficient to link the defendant to the contraband, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.
(footnote: 11)  Applying the appropriate standard of review,
(footnote: 12) we hold that the evidence, both direct and circumstantial, is legally sufficient to support the jury’s determination that there was a sufficient affirmative link between Appellant and the manufacture of methamphetamine to support her guilt.  We overrule Appellant’s first point. In her second point, Appellant contends that the evidence is legally insufficient to prove that the amount of methamphetamine that she was allegedly manufacturing was 400 grams or more.  As Appellant concedes, the State is no longer required to prove the amount of contraband separate and apart from the adulterants and dilutants that constitute the mixture.
(footnote: 13)  The State is required to prove only that the aggregate weight of the controlled substance mixture, including adulterants and dilutants, equals the alleged minimum weight.
(footnote: 14)  And, as the State points out, the Texas Health and Safety Code defines “controlled substance” as ”a substance, including a drug, an adulterant, and a dilutant, listed in Schedules I through V or Penalty Groups 1, 1-A, or 2 through 4.  The term includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance.”
(footnote: 15)
 After the evidence was collected, at least fifteen items were sent to John Harris, a forensic chemist at the Tarrant County Medical Examiner’s Office, for analysis.  Harris testified that each item contained methamphetamine.  State’s Exhibit 43, admitted into evidence, shows that the methamphetamine seized, including adulterants and dilutants, had an aggregate weight of 512.6 grams.

Appellant complains specifically about the evidence retrieved from the washing machine.  Three State’s exhibits, Nos. 37, 38, and 39, contained the substance removed from the washing machine.  According to Harris’s testimony, the aggregate methamphetamine in these exhibits was more than 200 grams.  Harris testified that when he received the liquids, he observed that they were “two-phase liquid with some residue or sediment . . . .  So to properly do the analysis, [he] separated the layers.  [He] took the top layer off and [he] analyzed it.  Then [he] analyzed the bottom layer.  Then [he] analyzed the sediment.”  On direct examination, he testified that the top layer would not have contained water.  The top layer and the sediment contained methamphetamine; the bottom layer contained water.  The weight of the bottom layer, that is, the water layer, was not included in the weight of methamphetamine reported.  On cross-examination, Harris admitted that he did not test the top layer or the sediment for water and that it was possible that water was also included in those layers.

Appellant argues that the top layers could have contained another substance that was not an adulterant or a dilutant and that the State had to prove that the other substances were in fact adulterants and dilutants.  We note that “‘[a]dulterant or dilutant’ means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance.”
(footnote: 16)  Consequently, if the water, detergent, or other foreign material that Appellant speculates may have been mixed in the top layer or the sediment did increase the bulk or quantity of the methamphetamine, then it is by definition an adulterant or dilutant.

The jury heard the testimony of the forensic chemist regarding his extraction of the methamphetamine solution and, as the State argues, could have concluded beyond a reasonable doubt that the aggregate weight of the methamphetamine was 400 grams or more.  Applying the appropriate standard of review,
(footnote: 17) we hold that the evidence is legally sufficient to prove that the  methamphetamine exceeded 400 grams.  We overrule Appellant’s second point.

Having overruled Appellant’s two points, we affirm the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

DELIVERED:  August 4, 2005

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
We note that the statement of Appellant’s first point provides that she is appealing the factual sufficiency of the evidence linking her to the manufacture of drugs, but she does not argue that the evidence is factually insufficient, nor does she cite cases for that standard of review.  Instead, she argues legal sufficiency of the evidence and cites cases for the legal sufficiency standard of review.  In the interest of justice, we address the legal sufficiency of the evidence linking her to the manufacture of drugs rather than overruling her first point on procedural grounds.  
See
 
Tex. R. App. P.
 38.1(e), (h).

3:
See East v. State
, 722 S.W.2d 170, 172 (Tex. App.—Fort Worth 1986, pet. ref’d).

4:
See
 
Brown v. State
, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995).

5:
Poindexter v. State
, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005).

6:
East
, 722 S.W.2d at 172.

7:
Id.
 at 171-72.

8:
Id.

9:
See id.

10:
See id.

11:
Poindexter
, 153 S.W.3d at 406.

12:
See Jackson v. Virginia, 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); 
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).

13:
See
 
Tex. Health & Safety Code Ann.
 § 481.112(f) (Vernon 2003).

14:
Isassi v. State
, 91 S.W.3d 807, 810 (Tex. App.—El Paso 2002, pet. ref’d).

15:
Tex. Health & Safety Code Ann.
 § 481.002(5) (Vernon Supp. 2004-05).

16:
Id.
 § 481.002(49).

17:
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Burden
, 55 S.W.3d at 612; 
Dewberry
, 4 S.W.3d at 740.