COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-454-CR
NO. 2-04-455-CR
  
  
MARCOS 
HERNANDEZ                                                           APPELLANT
  
V.
   
THE 
STATE OF TEXAS                                                                  STATE
 
  
------------
 
FROM 
THE 371ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        A 
jury convicted Appellant Marcos Hernandez of aggravated sexual assault with a 
deadly weapon, aggravated robbery with a deadly weapon, and burglary of a 
habitation with intent to commit sexual assault. The trial court sentenced him 
to twenty years on each count with the sentences to run concurrently. In two 
points, Appellant contends that the evidence is legally and factually 
insufficient to support his convictions. Because we hold that the evidence is 
legally and factually sufficient to support the convictions, we affirm the trial 
court’s judgments.
        The 
complainant testified. On the evening of September 7, 2002, the 
sixty-two-year-old complainant was asleep in bed. Suddenly, she heard a big 
thump, which she later discovered was caused by the window blinds falling into 
the bathtub, and a young man broke into her home through her bathroom window. At 
the sound of the thump, the complainant got up with her snub-nosed .22 revolver 
drawn. She shot at the perpetrator, but the gun misfired. He disarmed her and 
held the gun on her. Speaking English but with an accent, he told her to take 
her clothes off, and she refused. At that time, she could see his erect penis in 
his open blue jeans. He then went into the kitchen, and the complainant went out 
the front door to go to a friend’s home around the corner. She called the 
police from her friend’s home and gave a description of the perpetrator to the 
responding officer. The complainant said that she had not seen the perpetrator 
before, that he had a thick Mexican accent, and that he was wearing blue jeans 
and a shirt. She also testified that she had thought that the bathroom window 
was locked, but it was not. The door to the adjoining apartment was very near 
the complainant’s bathroom window.
        In 
her testimony, the complainant described the perpetrator as weighing about 185 
pounds; standing about five feet nine inches tall; having black hair, brown 
eyes, thick lips, and a mustache; and wearing, in addition to the blue jeans, a 
blue checkered shirt. Even though the police searched for the perpetrator by 
helicopter that night, they did not find him.
        Around 
midnight on September 14, 2002, the complainant had turned the television off 
after watching The Tonight Show, gone to bed, and dozed off when she heard a 
“blam” at the back door. The next thing she knew, someone had broken in 
through the back door by kicking it in. The man held a gun to her head and 
shoved her. She fell against the dresser. He then ripped her clothes off after 
she refused to take them off. He told her to give him oral sex, and she refused. 
He then forced his penis into her mouth, and later forcibly penetrated her 
vaginally. She testified that the vaginal rape lasted about an hour, it seemed 
like to her. After the vaginal assault, the man forced his penis into her mouth 
again.
        The 
complainant testified that she did not know whether he ejaculated, but she later 
testified on cross-examination that she did not think that he did and that she 
did not remember telling the police that he ejaculated when he was inside her or 
when he stood up.  On redirect, she testified that she recalled telling the 
police that he did not ejaculate in her mouth but that she thought that he did 
ejaculate during the vaginal assault because she was still very wet in her groin 
area.
        After 
the third act of penetration, the man tied her up with an electrical cord and 
demanded money. After she gave him some money, he put her in the bathroom 
closet, held the gun to the back of her head, and told her not to call the 
police. He left through the door that he had kicked in. After he left, she got 
out of the closet and looked out of the bathroom window to see where he went. 
She saw him go in the apartment next door and heard the door open and 
close.  She then got dressed and went to her friend’s home to call the 
police again. The complainant testified that she recognized the perpetrator, 
Appellant, from the incident that had occurred the week before.  He was 
dressed in blue khaki pants, a light blue polo shirt, and a cap.  The cap 
fell off before the sexual assaults.  She also identified the gun he 
brandished as the gun he had taken from her during the prior incident.
        The 
complainant’s friend also recounted the evening’s events.  Sometime 
after midnight, the complainant banged on her friend’s door, screaming.  
When the couple who lived there opened the door, they saw that she was crying 
and hysterical.  She told them that someone had broken into her apartment 
through her back door and raped her.  She said that he had made her give 
him oral sex at gunpoint. She also said that the gun belonged to her, and he had 
taken it from her. She said that he had tied her up and threatened to kill her 
if she called 911.  She also said that he had robbed her. The complainant 
told her friends that her attacker was a young Mexican who lived in the same 
apartment complex as she did and that she saw him go into his apartment after he 
left hers. The friend, who testified, called 911 while she was calming the 
complainant.
        Officer 
Watkins responded to the call, and he testified about his interview of the 
complainant and his interaction with Appellant. He arrived at the 
complainant’s friend’s home at about 1:30 a.m. The home was less than half a 
block from the crime scene. When he interviewed the complainant, she was crying, 
shaking, and having trouble breathing. She told Officer Watkins that she had 
been raped and robbed by someone who had kicked her door in to gain entry to her 
apartment. She also told him that the person had her gun, which had been stolen 
a week earlier. In describing the rape, the complainant told Officer Watkins 
that the perpetrator had grabbed her by her hair, thrown her on the bed, held 
the gun to her temple, and torn off her clothes and had then sexually assaulted 
her vaginally and orally. Afterward, the perpetrator demanded her wallet, and 
she gave him three dollars. He then tied her loosely with an electrical cord and 
put her in a closet. The complainant told Officer Watkins that the rapist said 
that he would kill her if she called the police. After the rapist left, the 
complainant told the officer, she heard the back door of the adjoining apartment 
open and close. She then ran to the neighbors’ home from which the 911 call 
originated.
        The 
complainant described the rapist to Officer Watkins as a Hispanic male in his 
mid-twenties who stood five feet, seven inches tall and weighed approximately 
165-170 pounds. He had short black hair and a mustache, and had left a baseball 
cap behind. She told Officer Watkins that she was 100% sure the perpetrator 
lived next door.
        About 
three hours later, the officers observed a man inside the apartment next door to 
the complainant’s who matched her description. They arrested him. At trial, 
Officer Watkins identified Appellant as the man who had been arrested. Even 
though Watkins did not tell Appellant the identity of the complainant and did 
not believe that anyone else had, while Appellant was being transported, he said 
that “he did not do anything with that fat old hag” and that he “want[ed] 
her ass thrown in jail after y’all find out I’m innocent.” Appellant 
agreed to give a DNA sample.
        The 
only identifiable DNA evidence found at the crime scene came from the cap. The 
evidence did not match Appellant’s DNA sample and, statistically, was only 
slightly more likely than not to belong to a cousin of Appellant’s. There was 
no evidence that Appellant had any cousins in the area, and there was testimony 
from several witnesses that he did not.
        A 
doctor examined the complainant at 4:00 a.m., a few hours after the assaults. 
The doctor testified that she noted that the complainant had several scratches 
on the right breast area and a slight discoloration and beginnings of bruising 
on the left.  The doctor took oral and vaginal swabs. The doctor also 
testified that the complainant had told her that her breast had been licked and 
that she had been digitally penetrated in addition to the penile penetration of 
her mouth and vaginal area. No semen was detected on or in the complainant.        Officer 
Eddleman testified that he and Officer Castillo spoke to Appellant’s father in 
the apartment next to the complainant’s shortly after the police interviewed 
her. Even though no one told Appellant's father what kind of crime the police 
were investigating, the officer testified that he said, “My son wouldn’t do 
anything to that old lady. He can get any woman he wants.” The father 
testified that he did say something like that after the police told him the 
circumstances of the offenses.
        Appellant’s 
boyfriend testified that Appellant was gay and was out at various clubs with him 
during the time that the aggravated robbery and aggravated sexual assault 
occurred. The boyfriend further testified that Appellant did not have a heavy 
accent and would not wear a cap such as the one found at the crime scene. Expert 
testimony provided that because rape is a crime of anger, power, and control, 
Appellant’s sexual identity is irrelevant.
        The 
complainant testified that she had seen Appellant and an older man moving things 
into the apartment next to hers on the day before the first attack.  But 
she also testified that she would not be surprised to hear that they had 
actually been living there approximately two to three weeks before the attack. 
She knew that they had not lived there long.  She saw her new neighbor 
twice during the week between the attacks but did not get a good look at 
him.  Less than twenty-four hours after the rape, the complainant 
identified Appellant as the perpetrator in a photospread.  After the second 
attack, she moved out of the apartment and went to live with her niece.
        In 
challenging the sufficiency of the evidence of the aggravated sexual assault and 
aggravated robbery, Appellant focuses on the lack of DNA evidence to tie him to 
the offenses and his boyfriend’s testimony providing an alibi for the time of 
the crimes.  In challenging the sufficiency of the evidence for the 
burglary, Appellant focuses on the late identification and the ordinariness of 
the gun involved.  The trier of fact is the sole judge of the weight and 
credibility of the evidence and the demeanor of the witnesses.[2]  
We may not substitute our judgment for that of the fact finder’s.[3]  Applying the appropriate standards of review for 
legal[4] and factual[5] 
sufficiency, we hold that the evidence is legally and factually sufficient to 
support Appellant’s convictions.  We overrule both of his points and 
affirm the trial court’s judgments.
   
   
                                                                  PER 
CURIAM
    

 
PANEL F:   DAUPHINOT, 
HOLMAN, and GARDNER, JJ.
 
DO NOT 
PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
August 25, 2005

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
See Tex. Code Crim. Proc. Ann. 
art. 38.04 (Vernon 1979); Zuniga v. State, 144 S.W.3d 477, 481 (Tex. 
Crim. App. 2004); Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 
2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).
3.  
Zuniga, 144 S.W.3d at 482; Dewberry v. State, 4 S.W.3d 735, 740 
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).
4.  
See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Burden 
v. State, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); Dewberry, 4 
S.W.3d at 740.
5.  
See Zuniga, 144 S.W.3d at 481-82, 484-87; Sims v. State, 99 S.W.3d 
600, 603 (Tex. Crim. App. 2003); Cain, 958 S.W.2d at 407.