Marcos Hernandez v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-454-CR

NO. 2-04-455-CR

MARCOS HERNANDEZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 371
ST
 DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

A jury convicted Appellant Marcos Hernandez of aggravated sexual assault with a deadly weapon, aggravated robbery with a deadly weapon, and burglary of a habitation with intent to commit sexual assault.  The trial court sentenced him to twenty years on each count with the sentences to run concurrently.  In two points, Appellant contends that the evidence is legally and factually insufficient to support his convictions.  Because we hold that the evidence is legally and factually sufficient to support the convictions, we affirm the trial court’s judgments.

The complainant testified.  On the evening of September 7, 2002, the sixty-two-year-old complainant was asleep in bed.  Suddenly, she heard a big thump, which she later discovered was caused by the window blinds falling into the bathtub, and a young man broke into her home through her bathroom window.  At the sound of the thump, the complainant got up with her snub-nosed .22 revolver drawn.  She shot at the perpetrator, but the gun misfired.  He disarmed her and held the gun on her.  Speaking English but with an accent, he told her to take her clothes off, and she refused.  At that time, she could see his erect penis in his open blue jeans.  He then went into the kitchen, and the complainant went out the front door to go to a friend’s home around the corner.  She called the police from her friend’s home and gave a description of the perpetrator to the responding officer.  The complainant said that she had not seen the perpetrator before, that he had a thick Mexican accent, and that he was wearing blue jeans and a shirt.  She also testified that she had thought that the bathroom window was locked, but it was not.  The door to the adjoining apartment was very near the complainant’s bathroom window.

In her testimony, the complainant described the perpetrator as weighing about 185 pounds; standing about five feet nine inches tall; having black hair, brown eyes, thick lips, and a mustache; and wearing, in addition to the blue jeans, a blue checkered shirt.  Even though the police searched for the perpetrator by helicopter that night, they did not find him.

Around midnight on September 14, 2002, the complainant had turned the television off after watching The Tonight Show, gone to bed, and dozed off when she heard a “blam” at the back door.  The next thing she knew, someone had broken in through the back door by kicking it in.  The man held a gun to her head and shoved her.  She fell against the dresser.  He then ripped her clothes off after she refused to take them off.  He told her to give him oral sex, and she refused.  He then forced his penis into her mouth, and later forcibly penetrated her vaginally.  She testified that the vaginal rape lasted about an hour, it seemed like to her.  After the vaginal assault, the man forced his penis into her mouth again.

The complainant testified that she did not know whether he ejaculated, but she later testified on cross-examination that she did not think that he did and that she did not remember telling the police that he ejaculated when he was inside her or when he stood up.  On redirect, she testified that she recalled telling the police that he did not ejaculate in her mouth but that she thought that he did ejaculate during the vaginal assault because she was still very wet in her groin area.

After the third act of penetration, the man tied her up with an electrical cord and demanded money.  After she gave him some money, he put her in the bathroom closet, held the gun to the back of her head, and told her not to call the police.  He left through the door that he had kicked in.  After he left, she got out of the closet and looked out of the bathroom window to see where he went.  She saw him go in the apartment next door and heard the door open and close.  She then got dressed and went to her friend’s home to call the police again.  The complainant testified that she recognized the perpetrator, Appellant, from the incident that had occurred the week before.  He was dressed in blue khaki pants, a light blue polo shirt, and a cap.  The cap fell off before the sexual assaults.  She also identified the gun he brandished as the gun he had taken from her during the prior incident.

The complainant’s friend also recounted the evening’s events.  Sometime after midnight, the complainant banged on her friend’s door, screaming.  When the couple who lived there opened the door, they saw that she was crying and hysterical.  She told them that someone had broken into her apartment through her back door and raped her.  She said that he had made her give him oral sex at gunpoint.  She also said that the gun belonged to her, and he had taken it from her.  She said that he had tied her up and threatened to kill her if she called 911.  She also said that he had robbed her.  The complainant told her friends that her attacker was a young Mexican who lived in the same apartment complex as she did and that she saw him go into his apartment after he left hers.  The friend, who testified, called 911 while she was calming the complainant.

Officer Watkins responded to the call, and he testified about his interview of the complainant and his interaction with Appellant.  He arrived at the complainant’s friend’s home at about 1:30 a.m.  The home was less than half a block from the crime scene.  When he interviewed the complainant, she was crying, shaking, and having trouble breathing.  She told Officer Watkins that she had been raped and robbed by someone who had kicked her door in to gain entry to her apartment.  She also told him that the person had her gun, which had been stolen a week earlier.  In describing the rape, the complainant told Officer Watkins that the perpetrator had grabbed her by her hair, thrown her on the bed, held the gun to her temple, and torn off her clothes and had then sexually assaulted her vaginally and orally.  Afterward, the perpetrator demanded her wallet, and she gave him three dollars.  He then tied her loosely with an electrical cord and put her in a closet.  The complainant told Officer Watkins that the rapist said that he would kill her if she called the police.  After the rapist left, the complainant told the officer, she heard the back door of the adjoining apartment open and close.  She then ran to the neighbors’ home from which the 911 call originated.

The complainant described the rapist to Officer Watkins as a Hispanic male in his mid-twenties who stood five feet, seven inches tall and weighed approximately 165-170 pounds.  He had short black hair and a mustache, and had left a baseball cap behind.  She told Officer Watkins that she was 100% sure the perpetrator lived next door.

About three hours later, the officers observed a man inside the apartment next door to the complainant’s who matched her description.  They arrested him.  At trial, Officer Watkins identified Appellant as the man who had been arrested.  Even though Watkins did not tell Appellant the identity of the complainant and did not believe that anyone else had, while Appellant was being transported, he said that “he did not do anything with that fat old hag” and that he “want[ed] her ass thrown in jail after y’all find out I’m innocent.” Appellant agreed to give a DNA sample.

The only identifiable DNA evidence found at the crime scene came from the cap.  The evidence did not match Appellant’s DNA sample and, statistically, was only slightly more likely than not to belong to a cousin of Appellant’s. There was no evidence that Appellant had any cousins in the area, and there was testimony from several witnesses that he did not.

A doctor examined the complainant at 4:00 a.m., a few hours after the assaults.  The doctor testified that she noted that the complainant had several scratches on the right breast area and a slight discoloration and beginnings of bruising on the left.  The doctor took oral and vaginal swabs.  The doctor also testified that the complainant had told her that her breast had been licked and that she had been digitally penetrated in addition to the penile penetration of her mouth and vaginal area.  No semen was detected on or in the complainant. Officer Eddleman testified that he and Officer Castillo spoke to Appellant’s father in the apartment next to the complainant’s shortly after the police interviewed her.  Even though no one told Appellant's father what kind of crime the police were investigating, the officer testified that he said, “My son wouldn’t do anything to that old lady.  He can get any woman he wants.”  The father testified that he did say something like that after the police told him the circumstances of the offenses.

Appellant’s boyfriend testified that Appellant was gay and was out at various clubs with him during the time that the aggravated robbery and aggravated sexual assault occurred.  The boyfriend further testified that Appellant did not have a heavy accent and would not wear a cap such as the one found at the crime scene.  Expert testimony provided that because rape is a crime of anger, power, and control, Appellant’s sexual identity is irrelevant. 

The complainant testified that she had seen Appellant and an older man moving things into the apartment next to hers on the day before the first attack.  But she also testified that she would not be surprised to hear that they had actually been living there approximately two to three weeks before the attack. She knew that they had not lived there long.  She saw her new neighbor twice during the week between the attacks but did not get a good look at him.  Less than twenty-four hours after the rape, the complainant identified Appellant as the perpetrator in a photospread.  After the second attack, she moved out of the apartment and went to live with her niece.

In challenging the sufficiency of the evidence of the aggravated sexual assault and aggravated robbery, Appellant focuses on the lack of DNA evidence to tie him to the offenses and his boyfriend’s testimony providing an alibi for the time of the crimes.  In challenging the sufficiency of the evidence for the burglary, Appellant focuses on the late identification and the ordinariness of the gun involved.  The trier of fact is the sole judge of the weight and credibility of the evidence and the demeanor of the witnesses.
(footnote: 2)  We may not substitute our judgment for that of the fact finder’s.
(footnote: 3)  Applying the appropriate standards of review for legal
(footnote: 4) and factual
(footnote: 5) sufficiency, we hold that the evidence is legally and factually sufficient to support Appellant’s convictions.  We overrule both of his points and affirm the trial court’s judgments.

PER CURIAM

PANEL F: DAUPHINOT, HOLMAN, and GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  August 25, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004);
 Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)
; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

3:
Zuniga
,
 
144 S.W.3d at 482; 
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).

4:
See Jackson v. Virginia
,
 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); 
Dewberry
, 4 S.W.3d at 740.

5:
See Zuniga
, 144 S.W.3d at 481-82, 484-87; 
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); 
Cain
, 958 S.W.2d at 407.