Johnny Solesbee v. The State of Texas

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-074-CR

JOHNNY SOLESBEE APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

After a jury convicted Appellant Johnny Solesbee of the manufacture of a controlled substance, methamphetamine, the trial court sentenced him to twenty-five years’ confinement in the Institutional Division of the Texas Department of Criminal Justice.  In one point, Appellant contends that there is no evidence to support his conviction because the only evidence that he had any connection with the methamphetamine was his mere presence at the scene of the offense.  Because we hold that the evidence is legally sufficient to support Appellant’s conviction, we affirm the trial court’s judgment.

Shane Norie, an investigator for the Cooke County Sheriff’s Office at the time of the offense, testified that in the late afternoon of January 24, 2005, he received information from  Gregg Taylor, a patrolman with Cooke County at the time, that Appellant and Mark Workman had a possible methamphetamine lab inside a home.  These two men were already known to Investigator Norie.  A civilian, Jenni Jones, who had voluntarily reported drug activity to Taylor for several months, had sent Taylor a text message that “she was in a trailer with some really stinky shit” that reminded her of cosmetology school.  Investigator Norie immediately drove to the reported scene, Workman’s mobile home at 1210 Parkside Circle in the community of Oak Ridge in Cooke County, Texas. Investigator Norie arrived at the scene ten to fifteen minutes after receiving the tip.  At some point before he reached the scene, whether it was in the original phone call from Gregg Taylor or in a follow-up conversation, Investigator Norie learned that odors were coming from the residence and that Appellant and Mark Workman were inside.

When Investigator Norie reached the residence, he could smell a very distinctive odor as he approached the front door that, based on his experience, led him to believe that a methamphetamine lab was inside.  He knocked on the door, and Jenni Jones answered it.  In response to his inquiry regarding the presence of other people in the house and their location, she directed him to the bathroom.  As he approached the bathroom, he saw Appellant in the doorway between the bathroom and the master bedroom, facing the bedroom, with his hand on the bathroom door, trying to close it.  The officer inferred that Appellant had just exited the bathroom.  The odor was stronger at that location.  Through the open door of the bathroom, Investigator Norie saw coffee filters, jars, glassware, and a bowl.  He then concluded that there was either an actual or potential methamphetamine lab in the bathroom.  The officer escorted Appellant to the front door, where other officers were waiting.  Investigator Norie then got Workman, who was nude, out of the shower, and the officers got him some clothes.

When Investigator Norie went back to the bathroom, he saw an open glass jar containing a mixture with a blue-tinged layer at the top and a brown layer at the bottom, solvents, a dual burner hot plate, a metal pan containing a plastic bowl that was melted at the bottom, some tubing, and a spoon containing white fluid.  Investigator Norie also noticed that the carpet around where the spoon was found was mashed, as if it had been eaten away by the chemicals.  The police also found a coffee filter, syringes, and needles in the master bedroom, and, elsewhere in the house, Coleman fuel, a gas mask with filters, a trash can with a white residue on the inside of its lip, triple beam scales, rock salt, many small baggies, pipes, and hoses.  The Texas Department of Public Safety lab determined that more than 850 grams of liquid methamphetamine was in the mixture from the jar.

Jenni Jones testified that she was Workman’s friend, that she was at his home every day or every other day, that on the day of the incident the air outside the home “smelled bad[,] like cosmetology,” and that it had never smelled that way before.  She saw Appellant, whom she had not met until that day, inside the home.  The smell was so bad that she had to wipe her eyes. When the police arrived, Jenni testified, Appellant said, “The cops are here.  The cops are here,” acted “like he didn’t know where to go, what way to go,” and was “running back and forth.”  He jumped over a table, went toward the kitchen, then back towards her, and then towards Workman’s bedroom.

Officer Taylor testified that about thirty minutes passed from the time Jenni Jones text-messaged him until Investigator Norie reached the mobile home.  Drug Enforcement Agent Vic Routh testified that based on his eighteen years’ experience, the smell, and the rate of separation of the chemicals, the drugs could have been manufactured in the last two or three hours before the police discovered the lab.

Appellant does not contest the presence of the methamphetamine or the lab but contends that only his mere presence connects him to the manufacture of the drugs and therefore that the evidence is legally insufficient to support his conviction.

In a similar case, we explained,

[F]or the State to obtain a conviction for the manufacture of a controlled substance, the State must affirmatively link the defendant either to an interest in the place where the manufacturing was taking place or to the actual act of manufacturing.  . . . [T]he requirement of an affirmative link is designed to protect the innocent bystander from conviction based solely upon his proximity to someone else’s drugs.  In a manufacturing case, the affirmative link must still be proven.  The nature of the offense of the manufacture of methamphetamine, however, shifts the emphasis from protecting the innocent bystander from conviction based solely upon his proximity to someone else’s drugs to protecting the innocent bystander who merely happens onto a methamphetamine lab inadvertently.  Although the affirmative links analysis is basically the same whether the offense is the possession of a controlled substance or the manufacture of a controlled substance, the factors considered may be different.  For example, manufacture of methamphetamine occurs in the open.  . . . When methamphetamine is being manufactured by [a traditional] method, there is a strong odor, not merely a residual odor; the paraphernalia are relatively cumbersome and clearly in plain view; and the quantity of contraband will be relatively high.  As a consequence, the fact that a defendant has a prolonged presence on the premises weighs more heavily against that defendant when methamphetamine is being manufactured on the premises.
(footnote: 2)

In 
Harris
, the appellant also raised a “mere presence” argument.
(footnote: 3)  She

was not in possession of a large amount of cash; she was not under the influence of drugs; she had no weapon; she made no furtive gestures; her fingerprints were not found on the premises. [She] claims that she did not attempt to flee and that she stopped as soon as she saw Deputy Teague.

. . . . Officer Teague testified that [Harris] ran out of the laundry room from the side door of the storage building.  A very strong odor of ether and hydrogen chloride gas came from the laundry room in the storage building.  The pitcher and jars containing chemicals and residue were in plain view in the laundry room.  The bag containing paperwork of [Harris] and her daughter was on the floor of the laundry room next to the running washing machine containing the drugs.  The generator in the laundry room was running.  At the same time, it appeared that somebody in the room that [Harris] exited had attempted to destroy evidence by putting the drugs, including the pyrex container, into the washing machine upon realizing that the officers were on the property. [Harris] ran from the structure, and her running could be seen as an attempt to flee.

In determining whether the evidence is sufficient to link the defendant to the contraband, the trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony.  Applying the appropriate standard of review, we hold that the evidence, both direct and circumstantial, is legally sufficient to support the jury's determination that there was a sufficient affirmative link between Appellant and the manufacture of methamphetamine to support her guilt.
(footnote: 4)
 Viewing the evidence in the case before us in the light most favorable to the verdict, Jones, a frequent visitor, had never met Appellant or smelled the odor at Workman’s home before Appellant’s arrival; Appellant remained at the home for approximately thirty minutes at a minimum; he behaved bizarrely when he noticed that the police were outside; and he attempted to hide the methamphetamine lab from the police by trying to close the bathroom door.  Based upon the appropriate standard of review,
(footnote: 5) we hold that the evidence is legally sufficient to affirmatively link Appellant to the offense and therefore support his conviction.  We overrule Appellant’s sole point and affirm the trial court’s judgment.

PER CURIAM

PANEL F: DAUPHINOT, J.; CAYCE, C.J.; and LIVINGSTON, J.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  July 20, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Harris v. State
, No. 2-04-202-CR, 2005 WL 1838976, at *1 (Tex. App.—Fort Worth Aug. 04, 2005, pet. ref’d) (mem. op.) (not designated for publication) (citations omitted).

3:
Id.

4:
Id. 
at *3 (citations omitted).

5:
See Jackson v. Virginia
,
 
443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001); 
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000) (all providing legal sufficiency standard of review)
;
 see also Poindexter v. State
, 153 S.W.3d 402, 406 (Tex. Crim. App. 2005);
 Brown v. State
, 911 S.W.2d 744, 748 (Tex. Crim. App. 1995); 
East v. State
, 722 S.W.2d 170, 171-72 (Tex. App.—Fort Worth 1986, pet. ref’d) (all discussing “affirmative links” rule).