COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-379-CR

 

 

MANUEL ANGEL LOZANO                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM COUNTY CRIMINAL
COURT NO. 5 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

                                                    

                                              ------------      

I.  Introduction








Appellant Manuel Angel Lozano appeals his
conviction for assault C bodily injury.  In his first two points, Lozano argues that
the evidence is legally and factually insufficient to establish that he
committed the offense of assault C bodily
injury.  In his third point, Lozano
contends that the trial court abused its discretion by overruling his hearsay
objection and by admitting into evidence text messages between Lozano and the
victim.  We will affirm.

II.  Factual and Procedural Background

A.     The State=s Case

Aileen Elizabeth Bah, who formerly worked for the
Irving Police Department, testified that she met Lozano, who also worked as an
officer for the Irving Police Department, in April 2005 when he brought a
prisoner into the jail where she was working. 
In May 2005, Bah and Lozano began to date.  As they dated, Bah noticed that Lozano=s
personality changed when he drank; he became physically and verbally abusive to
her. 

On October 15, 2005, Lozano called Bah and said
that he wanted to come over to her apartment and talk to her after he left a
party.  Several phone calls and text
messages later, Bah agreed that Lozano could come over if he had not been
drinking.  When Lozano did not arrive
within a reasonable time, Bah called him and told him that they could talk
another night. 








After 2 a.m. on October 16, Lozano and one of his
friends arrived at Bah=s house, and she noted that both
Lozano and his friend were intoxicated. 
Bah was irritated that Lozano had come over despite her decision that it
was too late and that they could talk another night.  Lozano and Bah argued about this.  Lozano told Bah how good it was to see her
and tried to hug her.  While his friend
used the restroom, Lozano kept trying to hug and kiss Bah.  Bah told Lozano that he and his friend needed
to leave, but the friend came out of the restroom and lay down on Bah=s
couch.  Lozano said that he wanted to
talk to Bah, so she followed him to her bedroom.[2]  Bah realized that Lozano was not there to
talk because he continued to try to hug and kiss her.  Bah believed that Lozano wanted to have sex
with her, but she did not want to have sex with him and told him to leave.  Lozano did not leave but instead sat on one
side of the bed and asked if he could stay until he was sober enough to drive
home. 

Bah went to the other side of the bed and lay
down with her back towards him.  Lozano
grabbed Bah=s right arm and tried to turn
her over towards him.  Bah tried to pull
her arm away from Lozano.  She cried and
told Lozano that he was hurting her and should let her go.  Lozano did not let go.  He turned Bah over on her back and straddled
her by sitting on her hips.  He held both
of her arms and tried to take her pajama bottoms off.  Bah testified that during this time, she was
struggling to pull her arms away from Lozano. 
Lozano told her how much he loved her, that he knew that she loved him,
and that she wanted Athis@ to
happen.  Bah interpreted Athis@ to mean
that she wanted him to be there. 








Bah continued to cry and tell Lozano that he was
hurting her and that he needed to leave. 
Bah did not yell for help because she knew her roommate would call Bah=s
brother (who is also an Irving police officer), and Bah did not want him to
come over. 

Bah struggled with Lozano for a few minutes and
then told him that she was going to call 911. 
Lozano Akind of laughed@ but
lifted his weight off her, so she slid out from underneath him and left the
bedroom.  Lozano followed Bah into the
living room and told her that he was sorry. 
At that point, Bah noted that both of her shoulders were hurting. 

Bah sat in a chair in the living room and cried,
and Lozano grabbed her by her arms, lifted her up, and walked her back to the
bedroom.  He tried to sit her on the end
of the bed, but she went into the hallway and sat down with her knees to her
chest.  Lozano sat down beside her and
told her that he missed her and that she was the only person he could
trust.  Bah told him that he needed to
leave.  Lozano said that if he left, he
would never speak to her again.  Bah told
him that was okay and that he should get his friend and leave.  Ultimately, Lozano awakened his friend, and
they left.  After Lozano and his friend
had left, Bah sat on her bed and cried because she was hurting emotionally and
physically. 








While they were driving, Lozano=s friend
asked him why they were leaving because he thought they were supposed to spend
the night at Bah=s apartment.  Lozano told his friend that he had gone into
Bah=s
bedroom, that she had gotten mad, that he had grabbed her by the arms to calm
her down, and that she had jerked away and hurt her arm. 

Later that same morning (October 16), Bah was in
pain and was upset.  The edges of her
shoulders and arms were painful where Lozano had grabbed her; however, she did
not notice any bruising.  Later that
morning, Bah was experiencing difficulty moving her left arm, so she tried to
rotate it and push it back into position. 
At that point, she heard a popping sound as her left shoulder snapped
back in the socket.  Bah testified that
her shoulder felt better after that, but it was still sore, tender, and
painful.  She could not move her left arm
above her head. 

Lozano called Bah that day and apologized for
coming over drunk.  After lunch, Bah
called Lozano and told him that she thought he had Areally
hurt@ her arm
because it was still painful.  He laughed
and told her to call the police department=s
internal affairs division.  He also told
her to call in sick and that he wanted to come over and talk about her
arm.  Bah told him that she did not want
him to come over. 








Right before she left for work, Bah called a
fellow detention officer because she was concerned that Lozano would come to
her apartment that night and because she wanted to know if something could be
done informally to prevent Lozano from communicating with her.  As Bah was on her way to work at around 2
p.m., Lozano sent her a text message asking if she had gone to work.  Bah did not respond. 

During her shift at the jail, Bah tried to avoid
performing tasks that required her to lift her arm[3]
and limited her activities primarily to data entry.  Around 6 p.m., Bah talked to the jail
lieutenant and two supervisors and told them that she was afraid of an officer
who worked at the jail.  She told them
about the events of the night before. 
Afterwards, she spoke with someone in internal affairs.[4]  They told Bah to leave work, and she went to
her brother=s apartment.  Lozano tried to contact her as she was
leaving, but she did not answer her phone. 








The next morning, Bah went to the neighborhood
doctor and told him that her shoulder had been injured by her ex-boyfriend and
that it had popped when she had tried to put it back in place.  Bah went to get her shoulder x-rayed, and the
x-ray revealed nothing significant.  Bah=s
neighborhood doctor told her to return if her shoulder continued to hurt.  Because Bah=s
shoulder continued to bother her, her doctor referred her to an
orthopedist.  

While she waited to get in to see the
orthopedist, Bah worked on light duty. 
Her shoulder was still bothering her when she got in to see the
orthopedist, and he ordered an MRI.  He
noticed an abnormality on the films that might require surgery, so he referred
Bah to a rotator cuff specialist.  

Before Bah saw the specialist, she went to
physical therapy for approximately one month. 
At the end of her physical therapy treatments, Bah still could not lift
her left arm above her head, so the doctor decided to do surgery to repair the
subscapularis muscle. 

Bah testified that she does not recall any prior
injury to her arms or shoulders.  She
said that she does not think Lozano came to her apartment with the intent to
injure her.  However, she believes that
Lozano caused her shoulder injury. 

 

 








B.     The Defense=s Case

Dr. Joseph Milne, an orthopedic surgeon
specializing in knee and shoulder surgery, testified regarding Bah=s
medical records.  Bah=s
records revealed that she had suffered shoulder subluxation, a condition caused
when the ball in her shoulder joint partially slipped out of its socket and
then popped back in, causing a small partial tear in a shoulder tendon.  Although an x-ray showed no evidence of a
dislocation, a fracture, or bone abnormality, Dr. Milne noted that the space in
Bah=s
shoulder was tight, which was a congenital condition, and admitted that the
injury might feel like a dislocated shoulder to a lay person.  Dr. Milne opined that it was possible that
Bah may have loose joints because she had dislocated fingers and toes in the
past. 

Dr. Milne said that there was no way to date the
injury found in Bah=s left shoulder and that he
could only rely on the patient history given by Bah.  He testified that the findings from Bah=s surgery
do not contradict the history Bah provided. 
He agreed that an injury similar to Bah=s could
occur in the way Bah believed her arm was injured by Lozano.  Dr. Milne stated that he had seen this type
of injury occur in spouses who had wrestled with one another.  He also said that pulling on heavy doors
could contribute to the type of tear that Bah=s
surgery repaired. 








After four of Lozano=s
character witnesses[5]
testified that he was not a Amean drunk@ and
that he was not abusive toward women, Lozano took the stand and testified that
he did not demean or control Bah.  He
then proceeded to give his account of the events of October 16, 2005.

Lozano said that Bah was mad when he and his
friend arrived.  Lozano and Bah went to
the bedroom, where he tried to kiss her, and Bah said that she wanted to go to
sleep.  Bah laid on her side with her
right shoulder in the air, and he tugged on her shirt.  When Bah did not respond, Lozano grabbed her
by her right arm, rolled her on her back, straddled her,[6]
and held her arms.  He had both his hands
on her arm, in an attempt to console her, and she pulled away. 

Lozano asked Bah if she wanted him to leave, and
she said, AYes.@  He was unsuccessful in waking up his friend,
so he lay down to go to sleep.  Bah went
and sat in a chair in the living room, and Lozano tried to wake his friend
again.  Bah then went to the hall and sat
down.  








Lozano said that he did not pick up Bah by her
arms and that she never complained that either of her arms hurt.  He testified that Bah grabbed his arm as he
was leaving and that he pulled away. 
Lozano denied telling his friend on the drive home that he had grabbed
Bah=s arm. 

Lozano called Bah the next morning, and she
apologized for getting mad at him the night before.  She also jokingly told him that her left arm
was sore and complained about having to go to work because the doors at the
jail were broken. 

Lozano testified that he had no intent to injure
Bah or to cause her pain.  He said that
he did not know that the way he held Bah=s arms
could cause her pain or injury.  Even to
this day, he does not know how he hurt Bah because the only time he had contact
with her was when he was holding her arms, trying to keep her from turning
over, so that he could talk to her.

C.     The Outcome

At the conclusion of the evidence, the jury
convicted Lozano of the offense of assault C bodily
injury.  The State and Lozano reached an
agreement regarding punishment, and the trial court followed the agreement,
which included a fine of $200 and 270 days in jail, probated for two years.  This appeal followed.

III.  Legally And Factually Sufficient Evidence To
Support Conviction








In his first two points, Lozano argues that the
evidence was legally and factually insufficient to establish that he committed
the offense of assault C bodily injury.  Specifically, Lozano contends that there was
no testimony from any medical personnel that established that Lozano caused the
injury to Bah=s left shoulder by holding her
down firmly. 

A.     Sufficiency Standards of Review

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).








This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s determination is manifestly
unjust.  Watson, 204 S.W.3d at
414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  To reverse under the second
ground, we must determine, with some objective basis in the record, that the
great weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Thus, we must give due deference to the
fact-finder=s determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@  Id. at 9.

An opinion addressing factual sufficiency must
include a discussion of the most important and relevant evidence that supports
the appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex. Crim. App. 2003). 

B.     The Law on Assault C Bodily
Injury








The penal code states that A[a]
person commits an offense if the person intentionally [or] knowingly . . .
causes bodily injury to another.@  Tex.
Penal Code Ann. ' 22.01(a)(1) (Vernon Supp.
2007).  A person acts knowingly, or with
knowledge, with respect to the nature of his conduct or to circumstances
surrounding his conduct when he is aware of the nature of his conduct or that
the circumstances exist.  Id. ' 6.03(b).  A person acts knowingly, or with knowledge,
with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.  Id.  A conviction for assault C bodily
injury can be sustained if evidence exists in the record that the defendant=s
actions were voluntary.  York v. State,
833 S.W.2d 734, 736 (Tex. App.CFort
Worth 1992, no pet.).  Additionally,
intent can be inferred from the acts, words, and conduct of the accused.  Id. (citing Dues v. State, 634
S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.] 1982)).  








The penal code defines Abodily
injury@ as Aphysical
pain, illness, or any impairment of physical condition.@  Tex.
Penal Code Ann. ' 1.07(a)(8) (Vernon Supp.
2007).  This definition is purposely
broad and seems to encompass even relatively minor physical contacts so long as
they constitute more than mere offensive touching.  York, 833 S.W.2d at 736 (citing Lane
v. State, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989)).  Thus, medical testimony is not necessary to
establish bodily injury.  See
generally Bolton v. State, 619 S.W.2d 166, 167 (Tex. Crim. App. 1981)
(holding that testimony by complaining witness that he had received a cut Aabout an
inch or an inch and a half wide and about two to two and a half inches deep@ was
sufficient to show bodily injury).

 

C.     The Complaint and The Evidence

Here, the complaint alleged that Lozano Adid then
and there intentionally or knowingly cause bodily injury to Aileen Bah by
grabbing or jerking her with his hand.@  Lozano does not deny that he put his hand on
Bah=s arm or
that he firmly held down Bah=s arm as
she struggled; Lozano claims his conduct was an attempt to console Bah.  Thus, Lozano argues that he did not intend to
hurt or injure Bah and that no medical evidence was presented by the State to
show that the tear in Bah=s shoulder tendon was caused by
his conduct. 








During the trial, Bah testified that she did not
think that Lozano came to her apartment with the intent to injure her.  Lozano likewise testified that he had no
intent to injure Bah or to cause her pain. 
The evidence, however, revealed that Lozano placed his hands on Bah to
roll her onto her back, that Lozano straddled Bah and firmly held down Bah=s left
arm while she struggled, and that this action caused her pain.  Bah attributed her shoulder injury to Lozano=s
conduct.  Lozano presented no evidence
that his actions were accidental or involuntary; that is, that he did not
intend to touch Bah=s arm, did not intend to roll
her over, and did not intend to straddle her and pin her arm down as she
struggled.  And the jury was free to
infer that when Lozano rolled Bah over and pinned her left arm down as she
struggled he did so with an awareness that his conduct was reasonably certain
to cause her some type of bodily injury. 
See Tex. Penal Code Ann.
'
6.03(b)  Therefore, the evidence
presented at trial permitted the jury to infer that Lozano possessed the
requisite Aknowingly@ mental
state when he injured Bah.  See id.;
York, 833 S.W.2d at 736.

Even though medical evidence is not required to
prove bodily injury, the evidence reveals that Lozano=s
medical expert, Dr. Milne, specifically testified that the findings from Bah=s
surgery did not contradict the medical history provided by Bah.  Dr. Milne agreed that the injury Bah suffered
could have occurred from the incident with Lozano, as described by Bah.  Even without Dr. Milne=s
testimony, Bah=s testimony that her shoulder
hurt and that she could not raise her left arm above her head is enough to
establish bodily injury under the broad definition in the penal code.  See Tex.
Penal Code Ann. ' 1.07(a)(8) (defining Abodily
injury@ to
include physical pain or  any impairment
of physical condition).








Finally, the jury, as the sole judge of the
credibility of witnesses, was free to reject Lozano=s
explanation that Bah=s shoulder had been injured on
the job as she attempted to close the jail cell doors.[7]


Reviewing all of the evidence in the light most
favorable to the verdict, a rational trier of fact could have found the
essential elements of assault C bodily
injury beyond a reasonable doubt.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Hampton, 165 S.W.3d at
693.  Viewing all the evidence in a
neutral light, we hold that, it is not so weak that the fact-finder=s
determination is clearly wrong and manifestly unjust.  See Watson, 204 S.W.3d at 414-15, 417;
Johnson, 23 S.W.3d at 11.  Therefore, we hold that the evidence is
legally and factually sufficient to support Lozano=s
conviction for assault C bodily injury.  See McGarity v. State, 5 S.W.3d 223,
232 (Tex. App.CSan Antonio 1999, no pet.)
(holding evidence legally and factually sufficient to support conviction for
assault C bodily
injury based on evidence that appellant pushed victim and hit her in the face
with his fist, fracturing her jaw).  We
overrule Lozano=s first and second points.

IV.  Text Messages Do Not Constitute Hearsay








In his third point, Lozano claims that the trial
court abused its discretion by overruling his hearsay objection and admitting
text messages between Lozano and Bah.[8]  The State responds that the trial court did
not abuse its discretion by admitting the text messages because they were
admissions by a party-opponent and do not constitute hearsay. 

We review a trial court=s ruling
admitting or excluding evidence for an abuse of discretion.  Prystash v. State, 3 S.W.3d 522, 527
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1102 (2000); Montgomery
v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).  Appellate courts should give great discretion
to the trial courts, reversing only if the trial court acts outside Athe zone
of reasonable disagreement.@  Montgomery, 810 S.W.2d at 391.  Thus, so long as the trial court=s
decision to admit or exclude evidence falls in the zone within which reasonable
minds may differ, appellate courts should refrain from disturbing the trial
court=s
decision on appeal.  Id.; Karnes
v. State, 127 S.W.3d 184, 189 (Tex. App.CFort
Worth 2003, no pet.). 

Rule of evidence 801(e) identifies circumstances
in which certain statements are not hearsay. 
Paredes v. State, 129 S.W.3d 530, 534 (Tex. Crim. App.
2004).  A statement is not hearsay if the
statement is offered against a party and is the party=s own
statement in either an individual or representative capacity.  Tex.
R. Evid. 801(e)(2)(A).








In this case, the text messages were offered
against Lozano and contained his statements. 
Thus, the text messages that Lozano authored were not hearsay; rather,
they constituted an admission by a party and were properly admitted into
evidence.  Id.; see also
Everett v. State, No. 14-01-00588-CR, 2002 WL 534124, at *2 (Tex. App.CHouston
[14th Dist.] April 11, 2002, pet. ref=d) (not
designated for publication) (holding that compilation of instant messages
between victim and appellant that victim compiled into a single document and
transmitted to a friend via electronic mail constituted an admission and was
properly admitted into evidence).  We
therefore overrule Lozano=s third point.

V.  Conclusion

Having overruled all of Lozano=s
points, we affirm the trial court=s
judgment.

 

SUE
WALKER

JUSTICE


 

PANEL B:   LIVINGSTON,
WALKER, and MCCOY, JJ.

 

MCCOY, J., dissents
without opinion.

 

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED: November 29,
2007

 

 

 








 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

                               EXHIBIT  A











 
 
 
 
 














 
 
 
 
 




 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 











 
 
 
 
 




 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 











 
 
 
 
 




 











 
 
 
 
 




 

 

 

 

 

 

 

 

 











[1]See Tex. R. App. P. 47.4.





[2]Bah=s roommate was asleep in
another bedroom. 





[3]The record reveals that
the jail cell doors had been malfunctioning around the time of this
incident.  The record also contains
conflicting testimony regarding whether the jail cell doors had to be
physically opened as a result of the malfunction. 





[4]Sergeant Bryan Redburn
testified that he investigated Bah=s claims by interviewing Lozano=s friend Pleasant Smith
who accompanied Lozano to Bah=s on the night in question. 





[5]Lozano=s character witnesses
included his ex-wife, a female friend, a co-worker, and an ex-girlfriend. 





[6]Lozano initially
testified that he did not straddle Bah. 
Later, he admitted that the statement he gave the investigators says
that he straddled Bah, but he claimed to have a different definition of Astraddling,@ which, to him, means
being over a person. 





[7]The jail supervisor
testified that the doors were opened automatically after a key was used to
activate them. 





[8]A copy of the text
messages at issue is attached as Exhibit A.